WALTER LEON WESCOTT *v.* STATE OF
MARYLAND

[No. 382, September Term, 1970.]

*Decided February 23, 1971.*

306

The cause was argued before ANDERSON, ORTH, and POWERS, JJ.

*Leroy W. Carroll* for appellant.

*Joseph P. Stafford, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Howard L. Cardin, State's Attorney for Baltimore City,* and *Joseph B. Harlan, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The question in this case is whether the warrantless arrest of Walter Leon Wescott on 15 January 1970 was legal. Effective 1 July 1969 a police officer has statutory authority to arrest without a warrant. Acts 1969, ch. 561, § 3. Code, Art. 27, § 594B (c) provides:

> "A police officer may arrest a person without a warrant if he has probable cause to believe that a felony has been committed or attempted and that such person has committed or attempted to commit a felony whether or not in his presence or view."

For the purposes of the section a "police officer" includes "any person who, in his official capacity, is authorized by law to make arrests and who is * * * [a] member of the Baltimore City Police Department.* * *." Code, Art. 27, § 594B (f) (2). Probable cause within the

contemplation of the statute has the same meaning it had under the common law rules of arrest without a warrant long followed in this jurisdiction. *Rife v. State,* 9 Md. App. 658, 663.[1] In *Cleveland v. State,* 8 Md. App. 204, we discussed probable cause in the context of belief that a felony has been committed and that the person arrested committed it. We said, at 218-219:

"Probable cause exists in this context when the facts and circumstances within the knowledge of the arresting officer, or of which he had reasonably trustworthy information, are sufficient to warrant a reasonably cautious person in believing that a felony had been committed by the person arrested. *Michaels v. State,* 2 Md. App. 424. The rule of probable cause is a nontechnical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse a mere suspicion. *Terrell v. State,* 3 Md. App. 340. Only the probability, and not a *prima facie* showing of criminal activity is the standard for probable cause. *Beck v. Ohio,* 379 U. S. 89, 96. And it is settled that the legality of an arrest is measured by the existence of probable cause at the time of the arrest. *Mullaney v. State,* 5 Md. App. 248."

And see *Boddie and Brooks v. State,* 6 Md. App. 523, 532; *Simms v. State,* 4 Md. App. 160, 167.

The warrantless arrest of appellant was made in Baltimore City by a police officer who was a member of the Baltimore City Police Department. See Code, Art. 27, § 594B, § i. An indictment was returned against appellant and came on for trial in the Criminal Court of Baltimore. At a bench trial he was convicted of having the narcotic drug cocaine in his possession on the day of his arrest. Prior to trial on the merits appellant made a verbal mo-

---

1. We stated in *Rife,* at 663, that subsections (a), (b) and (c) of the statute are declarative of such common law rules.

tion to "dismiss the indictment and for judgment of acquittal on the theory the arrest was unlawful and in violation of the Defendant's constitutional right." It was agreed that the motion be heard prior to trial. Of course, the illegality of an arrest is no ground for the dismissal of an indictment and we have consistently so held. See *Hammond and Couser v. State,* 7 Md. App. 588, 594. And the motion for judgment of acquittal was premature, no evidence having been offered. Rule 755 b. The proper motion would have been to suppress any evidence obtained by a search and seizure made incident to the arrest, for, if the arrest were illegal, the search and seizure would have been unreasonable and thus unlawful. Such motion may be made under the authority of Rule 729 a, under procedures as provided by subsection b 1 and determined by hearing prescribed by subsection d. In any event, we shall treat the motion as one to suppress evidence obtained by an unlawful search or seizure for it is apparent that the lower court so treated it upon ruling on the motion after a hearing. The court considered the evidence adduced with respect to the motion "in analyzing the problem as to whether or not the court should admit evidence about to be proffered on the theory that there was probable cause for the arrest." And upon finding that there was probable cause for the warrantless arrest, the court said: "I will, therefore, overrule your objection and proceed with the trial and introduce whatever evidence that may have been obtained as a result of this arrest. An automatic objection is taken by the Defendant to this ruling." See Rule 729, §§ e and f.

The only witness who testified on the question of the legality of the arrest was Detective Sergeant Leon N. Tomlin, C.I.D., Narcotics Unit, Baltimore City Police Department, a member of the Department since April 1960 and assigned to the Narcotic Unit of the Criminal Investigation Division, since November 1967. He was trained and experienced in investigation of violations of the narcotics laws. "I graduated from the Federal Bureau of Narcotics Training School in Washington, D. C. I have

attended many seminars. I have instructed at numerous seminars given by the Federal Bureau of Narcotics and Dangerous Drugs for the Baltimore City Police Department." He had participated in more than 300 investigations of narcotics offenses. He said the Narcotic Unit was "charged with the responsibility now of enforcing narcotic laws aimed at major violators in the Baltimore area." He had gathered information regarding some of the operation of major narcotic dealers. The sources of that information were the "Federal Bureau of Narcotics and Dangerous Drugs, the State police officers in the field, Intelligence file from our own office, previous arrest records, Lieutenant Coppinger in the State's Attorney's Squad, and various other investigative sources." There was a pattern as to the source of supply in this area. "[T]he pattern would be that a major source of supply in the Baltimore area would be in supervision of narcotic drugs for a limited amount of time. He would go to an out of town source, usually." He was familiar with the name James Thomas Wescott. "James Thomas Wescott is one of the major suppliers in the Baltimore area of narcotic drugs." The officer had knowledge of Wescott [2] and his operation. His study of the Wescott organization extended back into 1968. He had various sources of information concerning it—"informants that were interviewed, both by myself and Mr. Stewart [an Assistant State's Attorney] and other members of the Organized Crime Division, State's Attorney's office, Federal Bureau of Narcotics and Dangerous Drugs, Officer Herst of the Norfolk, Virginia Police Department, Narcotic Unit, Lieutenant Coppinger, Investigative Squad of the State's Attorney's office, Baltimore City police officers in the field and files and other investigative sources." The court found that the witness was qualified as an expert in the field of violations of the narcotics laws.

On 13 January 1970 about 10:00 P.M. Tomlin met with

2. Unless otherwise designated reference to "Wescott" hereinafter is to James Thomas Wescott and not to Walter Leon Wescott, Walter Leon Wescott will be referred to as "appellant."

an informer at a prearranged location in Baltimore City. "I classed the informant as reliable and I based this assessment of reliability on information that had been furnished to myself and other members of the Baltimore City Police Department, members of the State's Attorney's office, that in 1967 led to the arrest and conviction of four individuals for several burglaries, in 1968 the arrest and conviction of six individuals for narcotic violations at four separate locations in Baltimore City, also aware the informant was actively engaged in narcotic traffic and had knowledge of the inner workings of the narcotic traffic in Baltimore City." The informant gave him information:

> "I was told that James Thomas Wescott had informed the informant and other people involved in the sale and distribution of prohibited narcotic drugs in the Baltimore area to get their customers in line, he was ready to make a move. * * * The informant stated this meant that Wescott was going to purchase a supply of narcotic drugs and would probably go to the New York area, had driven and had flown at times, would remain in the New York City area for a couple days and then would return to the Baltimore area. The informant also stated that Margaret Thompson, 2405 Loyola Northway, Apartment 202, would usually leave the apartment at Loyola Northway, drive to 2322 Division Street, the home of her mother, where she would remain while James Thomas Wescott was out of town. * * * That this was the procedure Margaret Thompson usually followed when James Thomas Wescott left the Baltimore area to go out of town and purchase narcotic drugs. She gave us the reason Margaret Thompson was frightened and did not want to stay in the apartment by herself. * * * The informant also stated when Margaret Thompson left Division Street and returned to Loyola Northway, drugs

were on the way to Baltimore or in the Baltimore area."

The name Margaret Thompson was familiar to Tomlin. She had been arrested in November 1968 by Federal narcotic agents in Cleveland, Ohio while in possession of a large quantity of cocaine. He had this knowledge prior to 13 January 1970, having obtained the information through the files of the federal narcotic bureau and the F.B.I. By observation and surveillance in the Loyola Northway area, he learned that Margaret Thompson drove a late model Cougar, dark blue bottom and white vinyl top, Md. license HC-6531. He knew her by sight. On 9 August 1969 he had raided apartment 202, 2405 Loyola Northway and found papers in the names of Wescott and Thompson and male and female clothing from the one bedroom in the apartment. The informant further told Tomlin on 13 January that Apartment 103, 2410 Loyola Northway, which had been occupied by Alice Clagette, also known as Ida Mae Harrison, was presently being used by Sally Bryant. Wescott stayed there occasionally. Sally Bryant was pregnant and claimed it was Wescott's child. The informant "presently observed the distribution of prohibited narcotic drugs from this apartment."

The informant said that "the parking lot on the Esso Station, southwest corner of Greenspring and Cold Spring, had been used to park automobiles and entrance could be gained to the rear entrance to 2410 Loyola Northway by walking up a small embankment." He told Tomlin that Stancel Lee Stanbach was in town from the Charlotte area and was driving a light blue Continental, white vinyl top, which he obtained from Edward's Motors in Bel Air, Maryland. Tomlin knew that Stanbach had been arrested on 8 March 1968 in Charlotte, North Carolina, for possession of narcotic drugs and that he was an associate of Wescott and was acquainted with Sally Bryant.

Upon receiving all this information from informant,

Tomlin went to the 2300 block Division Street. About 11:00 or 11:15 P.M. he saw Margaret Thompson's car parked in front of her mother's house at 2322 Division Street. He then drove to the area of the 2400 block Loyola Northway and saw a light blue, late model Continental with a white vinyl top, Maryland license A 701. He ascertained from the Department of Motor Vehicles that this license was listed to Edward's Motors in Bel Air, Maryland. He then went to the Narcotic Unit office. "I set up a schedule, drew a diagram, dispatched each member of the Narcotic Unit to several locations in Baltimore City and Friendship International Airport." The diagram was of points to be placed under surveillance. Point A was 2322 Division Street. Points B, C, D and E were points in the vicinity of 2400 block Loyola Northway carefully selected to enable observation of 2405 and 2410 Loyola Northway and of the only possible entrance to the parking area at the Esso Station back of those premises. Tomlin deployed men to those points. He also sent two men to the Airport because the informant had indicated that at times the air lines were used in the transportation of drugs. From his experience he knew that it was "a common practice with people who were in a high level in the narcotic drugs to use couriers to transport drugs from one point to another * * * to avoid apprehension with the drugs in their possession."

The afternoon of 14 January Tomlin received a report from the officer manning point A that there was an increase in activity at 2322 Division Street; a number of large cars were in the area. Charles Stanley Jordan, also known as Squeekie, stopped his car in front of the house, entered, remained a short time and left. Tomlin knew that Jordan had been previously arrested and charged with the sale of heroin to a federal agent. And on another occasion when Jordan's home had been searched a large amount of adulterants, cutting equipment and capping material had been found. Tomlin concluded that Jordan "was about to deal in bulk quantities of prohibited narcotic drugs and actively engage in adulterating and cap-

ping of prohibited drugs for resale to consumers on the street."

About 1:00 A.M. on 15 January Tomlin received a report that Margaret Thompson had left 2322 Division Street in her Cougar and was driving northbound on Loyola Northway. This indicated to Tomlin that drugs were on the way to the Baltimore area. The police followed the Thompson car to the vicinity of 2405 Loyola Northway. About 1:30 A.M. he received a report from the officers at the Airport. The last flight into the Airport until 7:00 A.M. was due at 1:45 A.M. It was flight 599 Eastern Air Lines from New York. "They had been in constant communication with all air line officials and no one had registered on the passenger manifest by the name of Wescott" on that flight. But about 2:00 A.M. he received another report from the officers at the Airport. "They indicated Walter Leon Wescott had debarked flight 599, Eastern Air Lines, walked directly to a telephone booth in the area of the terminal, had made a phone call in which he said, 'Is this Wescott's wife?', paused and stated, 'I have the stuff.' "[3] Tomlin told the officers to follow appellant. They reported he entered Associate Cab No. 48 and proceeded toward Baltimore. Tomlin knew appellant from meeting him previously during an investigation. He had an artificial right eye and a black fur coat. He told Tomlin he was James Thomas Wescott's brother. The officer at the Airport who identified the man who got off the plane as appellant, had been with Tomlin at the prior meeting. Tomlin asked the officers following appellant if they were positive it was Walter Leon Wescott. "They stated, yes, he has a black fur coat on and an artificial right eye." Tomlin testified:

"I had constant contact from that point until I followed the route of the cab up the Baltimore-Washington Expressway, up Russell to Paca, Paca Street, up Jones Falls Expressway north

3. Wiretapping and electronic eavesdropping were not involved. The officers overheard the call "in person."

at the point where they neared Cold Spring Lane exit. I instructed Detective Buckheit and Detective Wilhelm [the officers who had followed appellant from the Airport] to get closer to the cab, that if the cab proceeded west on Cold Spring Lane and south on Greenspring in the 4300 block, I was going to stop the automobile in the 4300 block of Greenspring, which is a well lighted area. * * * I didn't want Wescott to get in the parking lot area or around the 2400 block Loyola Northway because of numerous cars in the vicinity and lack of lighting, and easy way to throw or hide anything in his possession. * * * It proceeded west on Cold Spring Lane, turned south on Greenspring Avenue. I then entered Greenspring Avenue from Loyola Southway, turned in front of the cab, stopped it, walked to the cab. * * * [S]eated in the back seat on the right-hand side is a person known to me as Walter Leon Wescott."

Tomlin arrested him.

Without objection, there were admitted into evidence in support of Tomlin's expertise with respect to the Wescott operation, a search warrant dated 14 May 1969 commanding the search of James Thomas Wescott and the premises 831 Druid Park Lake Drive, 2nd floor apartment and the affidavit on which it was issued, a search warrant dated 8 August 1969 commanding the search of James T. Wescott and Alice Clagette and the premises 2410 Loyola Northway, Apt. 103, and the affidavit on which it was issued, and an affidavit entitled "Wescott Affidavit IV" dated 9 March 1970 as to which Tomlin was the affiant. Each affidavit went to probable cause to believe that the narcotics laws were being violated and each tended to show the operations of James Thomas Wescott in illicit narcotic traffic at various places and divers persons therein engaged. There were also introduced photographs seized during the various raids made under au-

thority of the warrants. One showed James Thomas Wescott, Priola Bryant and Stanley Lee Stanbach together apparently at a bar. Another included appellant and Sally Bryant. Another was of James Wescott and Sally Bryant. Another included appellant, a bail bondsman, a Melvin Williams and James Thomas Wescott.

On cross-examination of Tomlin it was made clear that the informant related to Tomlin that James Thomas Wescott had told informant and other people engaged in the sale or distribution of prohibited narcotic drugs in the Baltimore area to get their customers in line, he was ready to make a move. The informant indicated that on occasion Wescott had flown or had driven to the New York area to purchase drugs. To the knowledge of Tomlin the couriers Wescott had used in the past to transport the drugs were females.

On re-direct examination the State adduced that Tomlin had knowledge that appellant had been active in illicit narcotic activities. He had been arrested in Norfolk, Virginia on 19 December 1969 for possession of heroin.

The lower court was satisfied that there was probable cause for the warrantless arrest of appellant and so are we. We have no difficulty whatsoever in determining that the facts and circumstances shown to have been within the knowledge of the arresting officer, or of which he had reasonably trustworthy information from an informant shown to be reliable, were sufficient to warrant a reasonably cautious person in believing that the felony of possession of a prohibited narcotic drug was being committed by appellant. Code, Art. 27, §§ 277 and 300 (a) as in effect at the time of the arrest. Tomlin had knowledge that James Thomas Wescott was engaged in illicit drug traffic; that he was about to have narcotics transported to the Baltimore area; that a method of his operation at times was to transport it by courier who traveled by plane from New York; that activity among James Thomas Wescott's henchmen indicated the receipt of drugs was imminent; that no one was on the 1:45 A.M. flight from New York under the name of Wescott; that

nevertheless Walter Leon Wescott was on that flight, obviously under an assumed name; that Walter Leon Wescott was James Thomas Wescott's brother and was known to have been engaged in narcotic operations; that Walter Leon Wescott, immediately upon embarking from the plane made a telephone call, asked for Wescott's wife and said "I have the stuff." [4] He then drove to the vicinity of 2405 Loyola Northway at which address it appeared from the activities of Margaret Thompson, James Thomas Wescott would go. Because of excellent work by the police, whose strategy was well planned and whose tactics was well executed, the arrest of appellant was lawful. Therefore the search of him incident thereto and the seizure of property obtained by the search were reasonable. We hold the court did not err in refusing to suppress the evidence; it was properly admissible. See *Draper v. United States,* 358 U. S. 307; *Spinelli v. United States,* 393 U. S. 410, which reverently affirmed *Draper;* *Owings v. State,* 8 Md. App. 572.

When appellant was searched at the scene of his arrest a small tinfoil package and two plastic sections of a drinking straw about two inches long were found in his left coat pocket.[5] Upon analysis a white powder in the tinfoil proved to be cocaine hydrochloride. Appellant was taken to the Narcotic Unit and strip searched. A plastic bag containing a white powder, wrapped in aluminum foil was recovered from an inner pocket of his fur coat. Upon analysis the powder proved to be cocaine hydrochloride, ninety percent. It weighed 150 grams, 5.08 ounces. Its wholesale value, "after it had been cut three times" would be "in the neighborhood of $19,000." Appellant was properly convicted of possession of cocaine.

*Judgment affirmed; appellant*
*to pay costs.*

---

4. The lower court observed: "The word 'stuff' is a word of art, in narcotics. It means prohibited drugs, usually heroin, but can mean cocaine or any other type of prohibited narcotic, I am sure."

5. Tomlin testified that such straws were inserted into the nostril and used to inhale cocaine in the nasal passage. This is called "snorting."