# CHARLES JAMES HEBRON *v.* STATE OF MARYLAND

[No. 102, September Term, 1971.]

*Decided October 6, 1971.*

* Note: *Certiorari* denied, Court of Appeals of Maryland, January 10, 1972.

The cause was argued before MORTON, ORTH and POWERS, JJ.

*Robert P. Conrad* for appellant.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Howard L. Cardin, State's Attorney for Baltimore City,* and *Charles O. Fisher, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

In asking us to set aside the judgments entered in the criminal action against him, Charles James Hebron does not deny that he broke the dwelling of Rosalie Burrell and stole her goods as was found at a bench trial in the Criminal Court of Baltimore. Rather he complains because constitutional rights accruing to him were violated in arriving at the convictions. He contends that his right to enjoy the assistance of counsel for his defense guaranteed by Amendment VI to the Constitution of the United States and his right to be secure in his person, house, papers and effects against unreasonable searches and seizures guaranteed by Amendment IV were denied him.

Hebron feels that absence of counsel at a pre-indictment proceeding in the Municipal Court of Baltimore City violated his Sixth Amendment rights. That proceeding, he urges, was in fact a preliminary hearing within the ambit of *Coleman and Stephens v. State of Alabama,* 399 U. S. 1, 90 S. Ct. 1999, decided 22 June 1970. But he argues, even if it were not a preliminary hearing but simply a hearing to set bail as the lower court found, the dictates of *Coleman* would apply to require that he have the assistance of counsel. The result would be that the lower court erred in denying upon a pretrial hearing a motion filed by him in proper person to dismiss the indictment.

Hebron alleges that his right to be secure against unreasonable searches and seizures was violated when evidence was obtained by the police incident to his arrest. He contends that his arrest was not shown to be on probable cause and was therefor illegal. As the arrest was illegal, the seizure of evidence incident thereto was unreasonable, and if the seizure was unreasonable the evidence was inadmissible under the judicially created exclusionary rule of the Fourth Amendment. See *Mapp v. Ohio*, 367 U. S. 643. It would follow that the lower court erred in overruling objection to the receipt of testimony relating to what was seized by the police.[1]

# I

The question as to right to counsel first requires determination of the nature of the proceeding conducted in the Municipal Court of Baltimore City on 16 September 1970. It was either a preliminary hearing or a hearing to set bail. If it was a preliminary hearing Hebron would have been entitled to the assistance of counsel. If it was a bail hearing the further question arises whether he was entitled to the assistance of counsel at such a proceeding.

# A

At the pretrial hearing on the motion to dismiss the indictment there was evidence adduced tending to show that Hebron was arrested 4 September 1970, the same day he was alleged to have committed the crimes. The following day he was taken before a Municipal Court judge for what Hebron said was a preliminary hearing. It was postponed upon his request for counsel. He appeared again without counsel before a Municipal Court judge on 16 September. With respect to this proceeding the lower court found that it was a bail hearing and not a preliminary hearing.[2] In so ruling the court made

---

1. The stolen articles themselves were not offered. A photograph of them was admitted without objection but after the objection made to testimony concerning them had been overruled. See Maryland Rule 729 f.
2. The judges of the Municipal Court sitting in the criminal di-

factual findings. It found that no testimony or evidence relevant to the substantive case against Hebron was given to the hearing judge, that no identification of Hebron was made, and that no pleas were entered by him. The Municipal Court Docket designated the proceeding as "Bail Hearing ONLY" and bail was set at $10,000 on the charge. A presentment was filed on 30 September and the indictment returned on 8 October. The factual findings were supported by credible evidence adduced. We cannot say the judgment of the lower court that the proceeding in the Municipal Court on 16 September was only a hearing to set bail was clearly erroneous on the evidence before it. Rule 1086.

**B**

*Coleman* held that the assistance of counsel at a preliminary hearing such as conducted in Maryland was constitutionally mandated.[3] The rationale of the holding was set out in the opinion of Mr. Justice Brennan in announcing the judgment of the Court. Noting that the principle of *Powell v. Alabama*, 287 U. S. 45 and succeeding cases requires that the Court scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself, he concluded that the guiding hand of counsel at the preliminary hearing was essential to protect the indigent accused against erroneous or improper prosecution. He spelled out the reasons, 399 U. S. 9:

"First, the lawyer's skilled examination and

---

vision have power to set bail and release on personal recognizance. Code, Art. 26, § 120 (a).

The primary purpose of a preliminary hearing is to determine whether there is probable cause to hold the accused for action of the grand jury on the offense charged. See *Mason v. State*, 2 Md. App. 768; *Timbers v. State*, 2 Md. App. 672.

3. We have held that the *Coleman* dictate applies only to cases in which the preliminary hearing was conducted on or after 22 June 1970, the date *Coleman* was decided. *Billings v. State*, 10 Md. App. 31, 35.

cross-examination of witnesses may expose fatal weaknesses in the State's case that may lead the magistrate to refuse to bind the accused over. Second, in any event, the skilled interrogation of witnesses by an experienced lawyer can fashion a vital impeachment tool for use in cross-examination of the State's witnesses at the trial, or preserve testimony favorable to the accused of a witness who does not appear at the trial. Third, trained counsel can more effectively discover the case the State has against his client and make possible the preparation of a proper defense to meet that case at the trial. Fourth, counsel can also be influential at the preliminary hearing in making effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail."

It was the inability of the indigent accused on his own right to realize these advantages of a lawyer's assistance which compelled the conclusion that the preliminary hearing was a "critical stage" of the criminal process at which the accused is as much entitled to aid of counsel as at the trial itself.[4]

Except that counsel may be influential in making effective argument as to the necessity of bail, we do not see how the other reasons set out in *Coleman* apply to a hearing the purpose of which is only to set bail and at which, as here, no witnesses were offered as to the substantive offense who could be examined or cross-examined, either to expose a fatal weakness in the State's case or to fashion a vital impeachment tool at trial or to preserve testimony favorable to the accused and no case was

---

4. Mr. Justice Douglas, Mr. Justice White and Mr. Justice Marshall joined Part II of the opinion in which this was set out. Mr. Justice Black concurred in the conclusion of Part II. He thought that the preliminary hearing was a stage of a criminal prosecution and the plain language of the sixth amendment required counsel in all criminal prosecutions. He also seemed to agree with the practical importance of the preliminary hearing as discussed in Part II. Thus the rationale had the concurrence of at least a majority of the Court.

offered by the State for the accused's counsel to discover and prepare for. We do not believe that the absence of counsel for Hebron at the hearing derogated from his right to a fair trial. We do not feel that the proceeding to set bail as here conducted was a critical stage of the criminal proceedings within the constitutional concept of that term contemplated by *Coleman*. We are not persuaded to extend the *Coleman* ruling to encompass it. We conclude that the assistance of counsel was not constitutionally mandated. We hold the lower court did not err in denying the motion to dismiss the indictment.[5]

## II

The articles Hebron sought to suppress were found, except for a bankbook, in a back second floor bedroom of 1503 Fulton Avenue. A television set was beside the bed. Clothing—"a fur coat, a maroon leather coat, rust colored wet-look plastic coat, and seven pairs of trousers, various

---

5. The Brennan opinion in *Coleman* made clear that although the trial transcript indicated that the prohibition against use by the State at trial of anything that occurred at the preliminary hearing was scrupulously observed, it may have been that the accused was otherwise prejudiced by absence of counsel at the preliminary hearing. It said the test was whether the error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U. S. 18. This appeared in Part III of the opinion. Mr. Justice Black, Mr. Justice Douglas, Mr. Justice White and Mr. Justice Marshall joined therein; thus a majority of the Court was represented. In the instant case the lower court found that even if counsel were required at Hebron's hearing, his absence was harmless beyond a reasonable doubt because of the nature of the hearing. It also noted:

> "[T]he defendant is now represented by Court-appointed counsel, qualified to explore possibilities available to the defendant to obtain a bail reduction: (1) the unique service offered by the Pre-trial Release Division of the Supreme Bench of Baltimore City, a representative of which would interview the defendant for the purpose of recommending reasonable bail; and (2) the filing of a *habeas corpus* petition in the Baltimore City Court, which will entitle the defendant to a prompt bail hearing in the Criminal Court of Baltimore."

Were it necessary for us to reach the point we would agree that if there was error it was harmless beyond a reasonable doubt. We note that bail was set at the hearing and there was no allegation that it was excessive. No prejudice whatsoever to Hebron was shown. Even if an accused is prejudiced by the absence of counsel in the circumstances of a given bail hearing, we have serious doubt whether the proper sanction ordinarily would be dismissal of the indictment, but we do not now decide the point.

colors, and six men's Italian knit shirts, one red wet-look shirt, extra large size, and black leather vest"—were on the bed. It seems that the bankbook was recovered from the person of Hebron—"[i]t was taken from the defendant." The bankbook was for an account in the Provident Bank in the name of Rosalie Burrell, 1706 North Dukeland Street. The circumstances under which the articles were seized were recounted by Detective William Perry, testifying for the prosecution and Detective H. Baynes, testifying for the defense. The officers, members of the Baltimore City Police Department, received a "lookout" over the radio while on duty in their cruiser on 4 September 1970. It is not clear from the record before us exactly what was in the bulletin. Perry at first testified: "We received, there was a broadcast through police radio to be on the look-out for a Diamond Cab No. 177, and it had two male occupants, and they had stolen goods, a television and some clothing." Later in his testimony the court asked him to tell again "just what was the information that you received by the police radio look-out?" The transcript reads:

> "THE WITNESS: It came over the police radio to be on the look-out for a Diamond Cab, No. 177.
> THE COURT: What other information in addition to that?
> THE WITNESS: It said that there were two male occupants, and they had supposedly broken into a house, and this is all the information that came over the radio.
> THE COURT: Was there any mention of, or description of the property.
> THE WITNESS: Yes. It stated that the clothing and television."

On re-cross it was elicited that the bulletin did not indicate when the goods had been stolen. Perry agreed that he had no independent knowledge that a crime had been committed or a burglary reported. "I was only going on

the information by the police radio. * * * They stated [the television set] had been taken, in the supposed burglary. Now, where the information came from, I don't know." Baynes added little with respect to the contents of the broadcast. Called by Hebron, he said: "[W]e received a call on the radio that a Diamond Cab and suspects in it, were supposed to have stolen goods * * *." That matter was not further pursued with him. Shortly after hearing the broadcast the officers saw Diamond Cab 177 occupied by two men, one of whom was Hebron. It stopped in front of 1503 Fulton Avenue and the two men entered the house carrying a television set and clothing. Baynes went to the front of the house and Perry covered the back. A man who had been in the cab started out the second floor rear window. "There's like a summer kitchen. There's a roof that you can come down, or out of the window, and possibly jump to the ground." The man was known to Perry only as "Sonny"; it was Hebron. Perry "advised" him at gunpoint "to go back in and that my partner was around the front." When sufficient units came to cover the premises, in "about five to six minutes, because as we saw the cab, we put it over the air", Perry went to the front to assist Baynes.

Meanwhile Baynes had gone to the front door and knocked. A woman, later identified as Ruth Jarrett, answered. When Baynes identified himself she slammed the door in his face. Baynes continued to knock and Hebron opened the door. In the hallway Baynes identified himself and asked Hebron who he was. Hebron gave the name of Moses Singleton and said he lived on the second floor. He showed the officer a gas bill in that name. Perry came in and the officers attempted to ascertain the true identity of Hebron. "We got permission from the defendant to go upstairs. We found the articles on the second floor. This is supposed to be part of his identification as far as him living there." On cross-examination Perry said Hebron and Baynes were in the living room when he entered the house through the open front door. "We were trying to ascertain who this fellow was. We

wanted some identification. * * * [H]e gave us the name of Singleton. * * * He told us we could go upstairs." Perry, Baynes and Hebron went upstairs. Perry could see into the back room where the articles were located. It was apparently the room Hebron "had gone through to come out * * * the window." Hebron and the seized articles were taken to the police station. After booking Hebron, Perry and Baynes went to 1706 North Dukeland Street, the home of Mrs. Rosalie Burrell. They were admitted and had a conversation with a young man named Burrell. Perry observed fresh pry marks on the front door and that the premises had been ransacked.

Rosalie Burrell testified that she had lived at 1706 North Dukeland Street for 20 years. On 4 September 1970 when she returned home from work at 3:30 P.M. Detectives Perry and Baynes and her five children were there "and some others were standing in front of my door. * * * The place was a mess. All wasn't taken out of the house was thrown all over the floor." She said that before she arrived home her son, James Burrell, called the police and notified them someone had broken into the house. From a photograph she identified the television set and clothing recovered in 1503 Fulton Avenue as stolen from her house. She was not asked about and made no mention of the Provident Bank Book. The photograph was admitted in evidence. It cannot be conclusively determined from an examination of it whether or not the bankbook appears therein. She said that although she had seen Hebron "before in the neighborhood" she had never given him permission to enter or consented to his entering her house nor had she allowed anyone except her children or family to enter.

Ruth Jarrett, testifying on behalf of Hebron, said she lived in an apartment on the first floor of 1503 North Fulton Avenue and answered the door when Baynes rang the bell. "I let him in to see what he wanted. * * * About that time I heard a sort of commotion upstairs and Hebron came to the top of the stairs, and said, 'Mrs. Ruth', he said, 'you go back', and I went back in my room,

in my back part of my apartment. That's it." She said Joseph Singleton lived on the second floor.

Joseph Singleton was called by Hebron. His testimony relevant to our inquiry was that Hebron did not live with him. "Once in a while he may spend the night. He does not live there." Asked if Hebron had permission to stay there Singleton said, "Yes, he does." On cross-examination it was elicited that Moses Singleton was his father but he, Joseph, paid the rent. He had never given Hebron a key to the premises but on 4 September Hebron had a key. He explained: "I'm being treated at Loch Raven Veteran's Hospital. I had an appointment at the hospital that morning at 8:00 o'clock. Mr. Hebron asked me could he stay in the apartment until I returned from the appointment, and I said, 'Yes, you may. If you're going to be there, I will leave the key on the coffee table.' I left, and left him there when I left, going to the hospital for this appointment."

Fully informed with regard to his right to testify or not, Hebron elected not to take the stand.

The Fourth Amendment not only guarantees security against unreasonable searches and seizures but also proscribes the issuance of warrants except on probable cause.[6] In so doing it provides a constitutional means by which the State can act to obtain evidence to be used in criminal prosecutions,[7] that is by searching for it and seizing it under the authority of a valid search and seizure warrant.[8] See Code, Art. 27, § 551. "Thus the

---

6. Amendment IV reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

7. *Mapp v. Ohio, supra,* made the federal exclusionary rule applicable to the States. *Ker v. California,* 374 U. S. 23, according to Mr. Justice Harlan concurring in *Coolidge v. New Hampshire,* 91 S. Ct. 2022, 2050, forced the States to follow all the ins and outs of the Supreme Court's Fourth Amendment decisions, handed down in federal cases.

8. Mr. Justice Black pointed out in his concurring and dissenting opinion in *Coolidge,* note 1 at 2054; "There are of course certain

most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Coolidge v. New Hampshire,* 91 S. Ct. 2022, 2032, *citing Katz v. United States,* 389 U. S. 347, 357.

One of the exceptions to the basic rule is a search and seizure incident to a legal arrest. A legal arrest is the first condition of a warrantless "search incident." The second condition is that the scope of the search must be within the limitations imposed by *Chimel v. California,* 395 U. S. 752, which substantially restricted the "search incident" exception, but did so only prospectively. *Williams v. United States,* 401 U. S. 646, 91 S. Ct. 1148, anticipated by this Court in *Scott v. State,* 7 Md. App. 505. An arrest is legal if under the authority of a valid arrest warrant. But a warrantless arrest may also be legal under certain conditions. The conditions when an arrest is made without a warrant by a police officer are now spelled out by statute although its provisions in part are declaratory of the common law. Code, Art. 27, § 594 B; *Rife v. State,* 9 Md. App. 658, 663. As at common law a police officer may arrest without a warrant: (a) a person who commits a felony or misdemeanor in his presence or view; (b) a person who the officer has probable cause to believe has committed a felony or misdemeanor in his presence or view; (c) a person who the officer has probable cause to believe has committed a felony whether or not in his presence or view. Subsection (d) of § 594 B, departing from the common law, includes exceptions to the "presence or view" requirement as to misdemeanors. Under it a police officer may arrest a person without a warrant if he has probable cause to believe (1) that certain designated offenses have been committed,

---

searches which constitutionally cannot be authorized even with a search warrant or subpoena." See e.g. *Boyd v. United States,* 116 U. S. 616 (1886); *Rochin v. California,* 342 U. S. 165, 174 (1952) (Black, J., concurring); *Schmerber v. California,* 384 U. S. 757, 773 (1966) (Black, J., dissenting).

and (2) that the person has committed such offense, and (3) unless immediately arrested: (i) he may not be apprehended, or (ii) he may cause injury to the person or damage to the property of another, or (iii) he may tamper with, dispose of, or destroy evidence. The designated offense in subsection (e) (1) (vi) is petit larceny, a misdemeanor under Art. 27, § 341.

We have found that "probable cause" within the contemplation of the statute has the same meaning it had under the common law. *Wescott v. State,* 11 Md. App. 305, 306-307, citing *Rife v. State, supra,* 663. We have discussed probable cause in a number of cases. Ordinarily it exists when the facts and circumstances within the knowledge of the arresting officer, or of which he had reasonably trustworthy information, are sufficient to warrant a reasonably cautious person in believing that a crime had been committed by the person arrested. The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse a mere suspicion. Only the probability and not a *prima facie* showing, of criminal activity is the standard for probable cause. It is the existence of probable cause at the time of an arrest which is the measure of the legality of the arrest. *Cleveland v. State,* 8 Md. App. 204; *Mullaney v. State,* 5 Md. App. 248; *Simms v. State,* 4 Md. App. 160; *Terrell v. State,* 3 Md. App. 340; *Michaels v. State,* 2 Md. App. 424. See *Beck v. Ohio,* 379 U. S. 89.[9]

It is the established law of this State that receipt by a police officer of information over a police radio may

9. The Court pointed out in *Whiteley v. Warden, Wyoming State Penitentiary,* 91 S. Ct. 1031 that it had consistently rejected the argument that a reviewing court should employ less stringent standards for reviewing a police officer's assessment of probable cause as a prelude to a warrantless arrest than the court would employ in reviewing a magistrate's assessment as a prelude to issuing an arrest or search warrant. It held that "the standards applicable to the factual basis supporting the officer's probable cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied with respect to the magistrate's assessment. At 1035-1036.

furnish probable cause for an arrest by him. And the arresting officer himself need not have within his personal knowledge facts and circumstances sufficient to constitute probable cause for the arrest if other members of the police team have such information and the arresting officer has been alerted to make the arrest. *Robinson v. State*, 4 Md. App. 515, 524. See *Lamot v. State*, 2 Md. App. 378; *Barton v. State*, 2 Md. App. 52.[10] In other words probable cause to arrest may be based on information collectively within the knowledge of the police. *Simmons v. State*, 8 Md. App. 355; *Mullaney v. State*, 5 Md. App. 248.

None of the challenged evidence here was obtained by the police under the authority of a search warrant. With regard to the bankbook, since we can only conclude from the record that it was seized from Hebron upon a search of his person, the seizure would be reasonable only if incident to a legal arrest of him. And since he was not arrested under the authority of an arrest warrant, his arrest to be legal would have to meet the statutory requirements. To meet the statutory requirements the record must reflect the existence of the requisite probable cause, either as within the knowledge of the arresting officer, or, the arresting officer having been alerted, as within the knowledge of members of the police team.[11]

Here the record reflects that James Burrell "called the police and notified them that someone had broken into

10. In *Whiteley v. Warden, Wyoming State Penitentiary, supra,* an arrest was made upon receipt of a radio bulletin to apprehend the subject of an arrest warrant. The Court did not question that the police were entitled to act on the strength of radio bulletin. "Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause." 91 S. Ct. at 1037. But, the Court continued: "Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."

11. "[T]he burden is on those seeking the exemption [from the basic rule] to show the need for it." *United States v. Jeffers*, 342 U. S. 48, 51, quoted in *Coolidge v. New Hampshire, supra*, at 2032. See *Evans v. State*, 11 Md. App. 451; *Sands v. State*, 9 Md. App. 71; *Winebrenner v. State*, 6 Md. App. 440.

the house." Although it would have been better had more details of the report been shown, it furnished the police with reasonably trustworthy information that a felony had been committed. Code, Art. 27, § 30 (b) ; *Evans v. State,* 11 Md. App. 451. The record further reflects that a bulletin was sent over the police radio, obviously, in the light of subsequent events, as a result of Burrell's report. The substance of the bulletin was that two men in Diamond Cab No. 177 had "supposedly broken into a house" and stolen a television and some clothing. But the record does not show that at the time of the broadcast facts and circumstances collectively within the knowledge of the police were sufficient to constitute probable cause to believe that the two occupants of the cab were the felons in the breaking reported for it is silent as to what information the police had concerning them. Perry admittedly had no knowledge of the crime other than the bulletin and the bulletin standing alone was not enough. The question is whether there were facts and circumstances which came to Perry's knowledge after receipt of the bulletin, which when considered with the bulletin amounted to probable cause to believe that Hebron had committed the felony.

Perry clearly had reason to believe that Hebron was one of the men who was the subject of the bulletin. He was one of two men in the cab which was the subject of the lookout. The men were in possession of a television and clothing, goods specified in the bulletin as stolen. The men were seen by Perry carrying the goods into 1503 Fulton Avenue. While these observations may not have brought the information in the bulletin up to probable cause to believe that Hebron had committed a breaking, when Baynes made his presence known at the front door of the house, there was evidence that the door was slammed in his face and that Hebron attempted to flee out of the second story window.[12] Hebron's attempted

---

12. The exact time this occurred was not given. However, it patently was in the early afternoon because when Mrs. Burrell arrived home at 3:30 P.M. Perry and Baynes were at her house.

flight, in the light of the other circumstances, could reasonably be viewed as evidence of guilt sufficient to permit Perry to believe that probably Hebron committed the breaking, or that he was in possession of stolen goods. See *Cleveland v. State, supra; Gardner v. State*, 6 Md. App. 483. We observe again that an officer is not required to have sufficient evidence to convict at the time of the arrest, or even a *prima facie* showing of criminal activity; only the probability of such activity is required. *Cornish v. State*, 6 Md. App. 167. See *Graham v. State*, 7 Md. App. 638; *Boddie v. State*, 6 Md. App. 523. For in dealing with probable cause we deal with probabilities. These are not technical; they are factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved. *Radcliffe v. State*, 6 Md. App. 285. Compare *Brown v. State*, 5 Md. App. 367.

Perry considered that the arrest of Hebron was effected when Hebron started out the window. "Mr. Hebron had been placed under arrest as I recognized him from attempting to come out of the window. He was placed under arrest because my gun was drawn, advising him to go back in. * * * He was under arrest from the time that he attempted to get out of the back window, so that kept him under arrest the whole time, as I entered the house." We agree that Hebron was to all intent and purpose arrested when he attempted to flee. He was physically taken into custody shortly thereafter when Perry went into the house. While the precise moment he was searched and the bankbook seized was not established, we think it patent that it was within such time as to be incident to the arrest. We hold the arrest was legal and the seizure of the bankbook reasonable.

We do not believe that the reasonableness of the seizure of the articles in the bedroom depends upon the "search incident" exception. *Chimel v. California, supra.* In considering the propriety of their seizure we first assume, in the light of Singleton's undisputed testimony, that

Hebron had standing to object. See *Jones v. United States*, 362 U. S. 257, in which the definition of the interest in the premises searched requisite to standing was enlarged to include anyone legitimately on the premises at the time of an unlawful search. At 267. See also *Walters v. State*, 8 Md. App. 583; *Scott v. State*, 7 Md. App. 505, note 10 at 531. Second, we note a cardinal rule with respect to the search of dwellings: probable cause for belief that certain articles subject to seizure are in a dwelling house cannot, of itself, justify a search thereof without a search warrant.[13] *Poms v. State*, 9 Md. App. 252. Third, we observe that no search is involved when articles are in plain view. *Munger v. State*, 7 Md. App. 710. Fourth, within the limitations discussed in *Coolidge v. New Hampshire, supra,* 2037-2041, the seizure of articles in the plain view of officers lawfully on the premises and which the officers have probable cause to believe are contraband or evidence is reasonable. *Graham v. State*, 6 Md. App. 458.

There was evidence from which the court could properly find that Baynes was admitted to the premises by the occupant of the first floor apartment and Perry, in any event, had the right to enter through the open door to effect custody of Hebron whom he had just at least constructively arrested attempting to escape out the window. *Mabane v. State*, 7 Md. App. 620; *Berigan v. State*, 2 Md. App. 666. Once they were lawfully on the premises, there was evidence that Hebron gave them permission to go to the second floor. The lower court's factual finding that Hebron gave such permission was not clearly erroneous. Thus the officers were lawfully on the second floor. On the evidence the lower court could properly find that the television and clothing were in plain view and that the observing of them was inadvertent and not by a search, for the testimony was that the purpose in going to the second floor was to establish

---

13. Compare this rule with the rule with respect to automobiles. See *Carroll v. United States*, 267 U. S. 132; *Chambers v. Maroney*, 399 U. S. 42.

the truth of Hebron's claim that he was Singleton, the second floor occupant. Having legally seen the articles, Perry had probable cause to believe they were the fruits of a crime for like reasons to those which led him to believe there was probable cause to arrest Hebron. Therefore, there being probable cause to believe the articles lawfully observed in plain view were stolen, the seizure of them by Perry was reasonable. We see nothing in *Coolidge* to compel a contrary conclusion on the exigent circumstances here. We hold the lower court did not err in overruling the objection relating to the articles seized in the bedroom. In so determining we have considered *Roundtree v. State,* 11 Md. App. 51, relied on by Hebron, and think it factually inapposite.

*Judgments affirmed.*