ROBERT LOUIS STEVENSON, JR., EDWARD CLIFTON
INGRAM, KENT ALTON WILSON AND ALFRED
ESTES *v.* STATE OF MARYLAND

[No. 1333, September Term, 1978.]

*Decided July 12, 1979.*

The cause was argued before MELVIN, MASON and COUCH, JJ.

*Geraldine Kenney Sweeney, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Robert C. Bonsib, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

COUCH, J., delivered the opinion of the Court.

Appellants Robert Louis Stevenson, Jr., Edward Clifton Ingram, Kent Alton Wilson and Alfred Estes were each convicted following a jury trial in the Circuit Court for Prince George's County (Melbourne, J.), of two counts of robbery with a dangerous and deadly weapon and one count of use of a handgun in a crime of violence. Each appellant was sentenced to a total of thirty years incarceration and each timely noted an appeal.

The factual background for these appeals is this: The First National Bank of Southern Maryland, located in the Marlow Heights Shopping Center, was robbed on April 4, 1978. Several males, some armed, entered the bank and took money from two bank tellers' cash drawers. Appellants Stevenson, Ingram and Wilson were arrested in the vicinity of the shopping center shortly after the robbery. Appellant Estes surrendered himself to the police several days later. Further facts will be supplied as each question presented by appellants is discussed. We are asked here to consider:

"1. Did the trial judge err in denying motions to suppress evidence derived from the illegal arrests of Appellants Stevenson, Wilson and Ingram?

2. Did the trial judge err in denying motions for judgments of acquittal made by Appellants Stevenson, Wilson and Ingram?

3. Did the trial judge err in denying motions for severance of defendants made by all Appellants?

4. Did the trial judge err in imposing separate, consecutive sentences for armed robbery and use of a handgun in commission of a crime of violence, when such charges merged?"

Inasmuch as certain of these issues apply only to some of the appellants, we shall discuss the non-common issues separately as to individual appellants. Those issues that are common to all appellants shall be considered together.

## 1

### Did the trial judge err in denying motions to suppress evidence derived from the illegal arrests of appellants: (a) Stevenson and Wilson

The record shows that at the time of the robbery three Washington, D. C. police detectives, in plain clothes, were riding in an unmarked car near the Prince George's County shopping center where the bank was located. One of the detectives, Officer Franklin, testified that he saw two men emerge running from a cloud of red smoke or dye, about 40 to 50 yards from the rear of the bank. One of the men had what seemed to be a bag in his hand from which apparently emanated smoke and bits of paper. The detective testified that he was familiar with the use by banks of a device, disguised as a packet of bills, which contains tear gas and dye. This device explodes shortly after it is removed from a drawer in the bank. He remarked to his two companions, "There must be a bank robbery and those two are possibly part of it." They pursued the two men by car and, after pulling abreast of the men, one of them identified himself as a police officer and ordered them to halt. One of the men turned and fled in the opposite direction. The second man turned into a driveway and found himself blocked by a blank

wall, where he was soon apprehended. This man was subsequently identified as appellant Wilson.

The other man (Stevenson) was ultimately apprehended by D. C. Officer Bartholomew, who had been in the car with Officer Franklin. Bartholomew testified that he assisted Franklin in subduing Wilson, then saw the other subject run across the street and gave chase. He said he believed this subject was one of the two men he had seen running earlier, since the height and clothing were similar. The officer lost sight of the man for five or ten minutes as he ran behind an office building. Bartholomew questioned bystanders as to whether they had seen anyone run through the area. They responded affirmatively and one person remarked, "He is in the bushes up there by that car." Bartholomew searched the bushes and found Stevenson lying on the ground. Stevenson was ordered out of the bushes and turned over to a Prince George's County police officer. Stevenson and Wilson moved to suppress all evidence concerning the arrest, and any fruits derived therefrom, on the basis of an illegal arrest which produced poisonous fruit. The thrust of their argument is simply that their arrests were illegal because the Washington, D. C. police officers who arrested them did not have actual knowledge that a felony had been committed or probable cause to believe they had committed it. The State contends it was only necessary to show that the arrestors had probable cause to believe a felony had been committed and that the appellants committed it.

A close reading of appellants' brief on this issue persuades us that they concede that the Washington, D. C. police officers were acting as private citizens [1] at the time of the

---

1. Our consideration of this case would be quite different if off-duty Prince George's County police officers were involved. Section 18-163 of the Prince George's County Code (1975) provides:

"Members of the Police Department are held to be always on duty, although periodically relieved from the routine performance thereof. They are subject at all times to orders from the proper authorities and to call by citizens. The fact that they may be off duty shall not be held as relieving them from the responsibility of taking police action in any matter coming to their attention requiring such action."

Thus, a Prince George's County policeman acts at all times in his official capacity and not as a private citizen.

arrests. Indeed, they conceded the point at oral argument. The trial court, in denying appellants' motion to suppress, did so on the basis that a citizen's arrest was being made and those making the arrests had probable cause to do so. This ruling was based upon *Great Atlantic & Pacific Tea Co. v. Paul,* 256 Md. 643, 261 A. 2d 731 (1970) (a civil case), wherein the Court of Appeals stated:

> "In Maryland a private person has authority to arrest without a warrant only when . . . a felony has in fact been committed whether or not in his presence, and the arrester has reasonable ground (probable cause) to believe the person he arrests has committed it . . ." *Id.* at 655.

We shall affirm the ruling of the trial court, but for a different reason. We find it unnecessary in resolving this issue to address the question of whether a private citizen, in making an arrest for a felony not committed in his presence, must have actual knowledge that the felony has been committed or may, as is the case with a police officer making an arrest under similar circumstances, make the arrest having only reasonable grounds to believe a felony has been committed. *Great Atlantic & Pacific Tea Co. v. Paul, supra; People v. Aldapa,* 17 C.A.3d 184, 94 Cal. Rptr. 579 (1971); 49 Opinions of Attorney General 11 (1964); 133 A.L.R. 603; *Law of Arrest in Maryland,* Kauffman, 5 Md. Law Review 125 (1941).

We base our holding on the conclusion that the motion to suppress was obviously founded on a claimed violation of appellants' rights under the Federal Fourth Amendment's prohibition against unreasonable searches and seizures, which would bring into play the exclusionary rule laid down in *Wong Sun v. U. S.,* 371 U. S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963). Under the facts and circumstances of this case the exclusionary rule is inapplicable. In the past it has been held repeatedly that "[B]y history, judicial rule and application, the exclusionary rule as to evidence seized in violation of the Fourth Amendment comes into play only when the evidence is obtained by governmental action." *Herbert v. State,* 10 Md.

App. 279, 284, 269 A. 2d 430 (1970), *cert. den.,* 260 Md. 720; *accord Ward v. State,* 30 Md. App. 113, 116, 351 A. 2d 452 (1976), *cert. den.,* 277 Md. 742. This Court in *Herbert v. State, supra,* elaborated further:

> "When an individual obtains incriminatory matter from an accused, no matter how improperly, and such matter comes into the possession of the government without a violation of the accused's rights by governmental authority, the exclusionary rule does not prohibit its use at trial." *Id.* at 284-85.

Appellants, citing *People v. Martin,* 225 Cal. App.2d 91, 36 Cal. Rptr. 924 (1964), and *Thacker v. Commonwealth,* 310 Ky. 702, 221 S.W.2d 682 (1949), argue that the Washington, D. C. police officers were acting as agents of the State even though they made the arrests merely as citizens. Thus, they contend there was governmental action so as to bring into operation the exclusionary rule. We find these cases distinguishable.

In *People v. Martin, supra,* three City of Los Angeles policemen obtained information that the defendant had previous convictions for possession and use of narcotics. The defendant was not a resident of Los Angeles but lived in the City of Alhambra. The Los Angeles policemen traveled to the defendant's hotel in Alhambra. Once there, they approached the defendant in the hallway of the hotel; one officer identified himself as such and they arrested defendant for use of narcotics. The officers, having obtained permission to enter the hotel room from the defendant, searched it and found a quantity of heroin. The State argued upon the authority of *Burdeau v. McDowell,* 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048 (1921), that the heroin was admissible since it was obtained in an unreasonable search and seizure by a private citizen. The California Court held *Burdeau* inapplicable and stated the following as its reason:

> "... [T]he evidence was discovered by the arresting officers themselves, albeit as private citizens. Their citizen's arrest was illegal ... (... no misdemeanor offense was either attempted or committed in their presence). Their search of

defendant's premises, as an incident to their illegal citizen's arrest, was also illegal . . . The seizure of the evidence during that illegal search must be realistically construed . . . *It was in the performance of their duties as officers and as employees and agents of the state.* In fact, Officer Wesley so indicated when he identified the officers to defendant: '. . . stated, police officers.' Accordingly, the search and seizure must be held . . . to have been within the proscriptions of both the state and federal constitutions." (Emphasis added.) 36 Cal. Rptr. at 927.

The Kentucky Court in *Thacker v. Commonwealth, supra,* held that citizen arrestors, who were particularly instructed by local police officers, the sheriff of the county, and state patrolmen to watch for a certain automobile and apprehend its occupants, one of whom was suspected of murder, were subject to the proscriptions against unlawful searches and seizures contained in Section 10 of the Kentucky Constitution. According to the Court a private individual, acting in concert with or at the direction of a peace officer must abide by Section 10 of the Kentucky Constitution. *Id.* at 683.

The present case bears no resemblance to either *People v. Martin, supra,* or *Thacker v. Commonwealth, supra.* Unlike the police officers in *Martin,* the officers here were not acting in the course of an investigation when they apprehended the appellants, although one D. C. detective did identify himself as a police officer. These detectives were in plain clothes, traveling in an unmarked car, and apparently off-duty. They simply did not invoke the authority of the State by their actions. Thus, we cannot conclude that they were engaged in the performance of their duties as officers and as employees and agents of the State. *People v. Martin, supra* at 927.

Nor do we think *Thacker* applicable to the present situation. None of the Washington, D. C. detectives were acting at the express direction of Maryland law enforcement authorities.

In the instant case the arrests were made by Washington police officers acting as private citizens. There is no evidence of government complicity on the part of the District of

Columbia or the State of Maryland. Since this is true, then it follows that the evidence to be suppressed cannot be said to flow from impermissible government action, thus the exclusionary rule is not applicable and the motion was properly denied. *Herbert v. State, supra* at 285.

### (b) Ingram

Ingram's arrest was effected by a Prince George's County police officer under circumstances that appellant contends constituted an illegal arrest and thus all evidence of the arrest and its fruits should have been suppressed. This contention is based on the claim that the police officer lacked probable cause to make the arrest. Even if we were to agree with this sweeping, all-inclusive contention, which we do not (*see Baker v. State,* 39 Md. App. 133, 383 A. 2d 698 (1978)), we nevertheless find no merit to the argument because it is evident from the record that the arresting officer had probable cause to make the arrest. It seems settled in Maryland, and elsewhere, that a police officer may make a warrantless arrest for a felony committed in his presence, or out of his presence if he has reasonable grounds to believe a felony has been committed and probable cause to believe the person arrested committed it. *See* Art. 27, Sec. 594B, subsection (c), which specifically grants this authority and has been determined to be declarative of common law rules of arrest without a warrant. *See Wescott v. State,* 11 Md. App. 305, 273 A. 2d 824 (1971), *cert. den.,* 262 Md. 750. We have previously defined probable cause, in the context of warrantless arrests, as follows:

> "Probable cause exists in this context when the facts and circumstances within the knowledge of the arresting officer, or of which he had reasonably trustworthy information, are sufficient to warrant a reasonably cautious person in believing that a felony had been committed by the person arrested."
> *Id.* at 307, quoting *Cleveland v. State,* 8 Md. App. 204, 218-19, 259 A. 2d 73 (1969), *cert. den.,* 257 Md.

732; *see also Williams v. State,* 14 Md. App. 619, 287 A. 2d 803 (1972).

Turning now to the facts and circumstances surrounding Ingram's arrest, the record demonstrates that the arresting police officer, Sgt. Putnam, who was off duty, was conducting personal business a few doors from the subject bank when he became aware that a robbery was in progress at the bank. He proceeded toward the bank, following Sgt. Poe, a commissioned special security guard. Both had their guns drawn. Two men were seen coming out of the bank, the first carrying a handgun. When the men were ordered to halt the gunman ran toward the parking lot, where he escaped in an automobile, and the other man ran in the opposite direction. Putnam testified that before pursuing the gunman, he noticed the second man was wearing a burnt orange, lightweight jacket and a hat. When he returned to the bank after his unsuccessful pursuit of the gunman, he was advised that the second man had gone to the rear of the bank. He went to the rear of the bank and observed this individual standing on the sidewalk. Putnam further testified as follows:

"Q. Now, when you approached that individual over there, was there anything about that individual in addition to what the civilian witnesses had told you that led you to believe that that person was also involved in the robbery?

A. His physical stature, his body language. Like I said, skiddish, indecisive as to where to go, what to do, and the clothing was the same.

Q. Tell us about the clothing. What about the clothing that made you think that was a person involved in the robbery?

A. The two gentlemen that came out of the bank, the first moment I saw them, the second gentleman was wearing the same clothing that the guy in the rear of the bank had on, which was a lightweight burnt orange type jacket and a hat.

Q. What about physical stature?

A. Medium complexion, Negro male, medium build, 150 pounds.

Q. Are you referring to the person you saw in front of the bank or the person you saw on 28th Avenue?

A. One and the same.

Q. Those characteristics were the same on both?

A. Yes.

\* \* \* \*

I recognized him in my mind to be the person that I had initially seen at the front door."

Thereafter, Putnam arrested this man and identified him as appellant Ingram.

From this evidence we have no difficulty concluding that the trial court was correct in denying appellant's motion to suppress. We believe that these facts amply demonstrate that a reasonably cautious person would believe a felony had been committed and that appellant was one of the persons who committed it; thus Sgt. Putnam had sufficient probable cause to make the arrest.

2

*Did the trial court err in denying motions for judgment of acquittal made by appellants Stevenson, Wilson and Ingram?*

Appellants Stevenson, Wilson and Ingram next argue that had their motion to suppress been granted, as it should have been, then the evidence would be insufficient to sustain their convictions. We need not dwell long on this issue in light of our holding on the suppression issue. We do not understand these appellants to contend that if the trial court was correct (as we now hold) in denying their motion to suppress there would then be insufficient evidence to support their convictions. We find no merit to this contention whatsoever.

3

*Should the cases have been severed for trial?*

Appellants urge us to hold that the trial court erred in denying their respective motions for severance; we shall decline to so hold.

All of the appellants moved to sever their trials from those of the others and asked thereby for four separate trials. The trial court denied their pretrial motions as well as similar motions made during the course of the trial. In analyzing whether there was error in the denial of appellants' motions, we begin by referring to Md. Rule 745 c, which provides:

> "If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents or defendants, the court may, upon its own motion or the motion of any party, order separate trials of counts, charging documents or defendants, or grant any other relief justice requires."

This rule and its similar predecessors have been interpreted many times by the Court of Appeals and this Court. We can synthesize certain guiding principles to be followed in determining this issue from an examination of these cases. The purpose of Rule 745, providing for joint trials and separate trials under certain circumstances, is to save the time and expense of separate trials and to allow for separate trials as justice requires. *See generally Lewis v. State,* 235 Md. 588, 202 A. 2d 370 (1964); *Grandison v. State,* 32 Md. App. 705, 363 A. 2d 523 (1976), *cert. denied,* 279 Md. 682. The decision as to whether to grant a severance lies within the sound discretion of the trial judge. *McKnight v. State,* 280 Md. 604, 375 A. 2d 551 (1977); *Jones v. State,* 38 Md. App. 432, 381 A. 2d 317 (1978). Furthermore, joinder for trial is dictated under circumstances where most, if not all, of the evidence admitted at trial would have been admissible in each trial if the several defendants had been tried separately. *Johnson v. State,* 38 Md. App. 306, 381 A. 2d 303 (1977).

In examining the record we observe that all of the defendants were charged in a single indictment with

committing the same offenses and that such offenses flowed from a bank robbery in which they all allegedly participated. Thus it would appear that nearly all of the evidence needed to prove guilt in a joint trial would have been introduced in separate trials and would have been admissible. This case is readily distinguishable from such cases as *McChan v. State,* 238 Md. 149, 207 A. 2d 632 (1965), *cert. den.,* 384 U. S. 1021, and *Shingleton v. State,* 39 Md. App. 527, 387 A. 2d 1134 (1978). In *McChan,* the defendant was put on trial with his codefendants in four cases in which he was charged jointly with at least two of the other defendants, and in three cases in which he was not charged at all. The Court of Appeals concluded that this was improper, based on its finding in *Lewis v. State, supra,* that the defendants could not have been charged in a single indictment because the offenses were different as to each and, absent their agreement, they could not be tried jointly. In *Shingleton,* the defendant was compelled to stand trial with two codefendants at the same time that other substantive charges, not connected with the defendant, were being pressed against the two codefendants. This was held to have been an abuse of discretion. We conclude, under the facts and circumstances present in this case, that there was no abuse of discretion in denying the severance.

4

*Should the convictions for robbery with a deadly and dangerous weapon merge with the conviction for unlawful use of a handgun in the commission of a crime of violence?*

Appellants were convicted of two counts of armed robbery and one count for use of a handgun. For the latter convictions they received consecutive sentences. No complaint was made below regarding this issue and ordinarily we would not consider it on appeal, Md. Rule 1085. We shall consider the issue, however, since consecutive sentences were meted out. *Rose v. State,* 37 Md. App. 388, 377 A. 2d 588 (1977). We are asked to vacate the handgun sentence on the strength of

*Brooks v. State,* 284 Md. 416, 397 A. 2d 596 (1979), wherein the Court of Appeals stated in part:

> "... even though offenses may be separate and distinct under the required evidence test, courts occasionally find as a matter of statutory interpretation that the Legislature did not intend, under the circumstances involved, that a person could be convicted of two particular offenses growing out of the same act or transaction." *Id.* at 423.

Appellants argue that the legislative intent in both the armed robbery and handgun statutes was to increase the maximum sentence where a weapon was involved, not to subject offenders to two additional penalties for the same aggravating circumstances of the crime of robbery. We do not agree. We believe the legislative intent simply was to impose a more severe penalty in an armed robbery situation when any kind of deadly weapon is used and to increase that penalty when a handgun is used. As we said in *Wright v. State,* 24 Md. App. 309, 330 A. 2d 482 (1975), *cert. den.,* 274 Md. 733:

> "The statute, after generally defining the crime, designates it as a 'separate misdemeanor.' It then provides that the sentence, which may range from 5 to 15 years, shall be 'in addition to any other sentences' which may be imposed. The dominant purpose of this language and of all of Section 36B is to stop the alarming rise in the use of handguns in the commission of crimes of violence. Md. Code, Art. 27, § 36 (a)." *Id.* at 317.

While not argued here, we note it has been held that the imposition of separate sentences for robbery with a deadly weapon and the use of a handgun in the commission of a felony does not violate double jeopardy principles. *See Coates v. State of Maryland,* 436 F. Supp. 226 (1977).

*Judgments affirmed.*
*Costs to be paid by appellants.*