646 A.2d 1064

**Rodney Eugene SOLOMON**

v.

**STATE of Maryland.**

**No. 1538, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Sept. 2, 1994.

Michael R. Braudes and Margaret L. Lanier, Asst. Public Defenders (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Submitted before MOYLAN, and FISCHER, JJ., and ROSALYN B. BELL, Judge (Ret., Specially Assigned).

MOYLAN, Judge.

This case involves one consummated carjacking and two attempted carjackings, all of which occurred within a tight

geographic radius in the southern corner of Howard County and within the narrow time frame of between fifteen and twenty-five minutes on the morning of September 8, 1992. The consummated carjacking resulted in a first-degree murder as tragic and as vicious as any that the pages of these reports have ever been called upon to recount. The trial of the appellant, Rodney Eugene Solomon, was removed from Howard County to Baltimore County. A codefendant, Bernard Miller, was tried in Howard County, was convicted of first-degree felony murder and other offenses, and was sentenced to a term of life imprisonment plus ten years.

A Baltimore County jury, presided over by Judge Dana M. Levitz, subsequently convicted the appellant of the first-degree murder of Pam Basu, the robbery of Pam Basu, the kidnapping of Pam Basu, the kidnapping of one-year-old Sarina Basu, the robbery of Grace Lagana, and the assault with intent to rob Laura Ann Becraft. The jury sentenced the appellant to life imprisonment without the possibility of parole.

### Denial of Trial Severance

Although the appellant raises the single contention that Judge Levitz erroneously denied his motion for separate trials of the charges with respect to each of the three adult victims, he fragments the claim into three sub-contentions. He maintains that the State failed to establish:

1) that the evidence with respect to each of the three sets of charges would be mutually admissible if the three sets of charges were tried separately;

2) that each of the three criminal episodes was proved to the satisfaction of the trial judge by the clear and convincing standard of persuasion before evidence as to it was received in evidence at the trial; and

3) that the probative value, including need, for the incremental evidence outweighed the potential prejudice against the appellant.

### *A Blurred Boundary: Avoiding the Pitfalls*

█ Before we can begin to address any of those sub-contentions (and perhaps to dismiss one or two as totally inapposite to the issue before us), there is some serious sorting out that must be done and a doctrinal boundary line that needs to be clearly defined. The appellant has indiscriminately mixed two distinct, albeit partially overlapping, legal doctrines. His confusion is understandable because some of our case law has, within the last several years, lapsed into the same error of uncritically commingling two separate sets of legal principles. We need carefully to compartmentalize the procedural issue of joinder/severance from the evidentiary issue of the admissibility of "other crimes" evidence. They are not the same. They call for different analyses. The applicability of one to the question at hand does not imply the applicability of the other. *Wieland v. State*, 101 Md.App. 1, 643 A.2d 446 (1994).

### *Trial Joinder and Severance: A Problem of Criminal Procedure*

The closely related problems of when to join multiple defendants for a consolidated trial and when to join multiple charges against a single defendant for a consolidated trial are time-honored aspects of criminal procedure. Maryland Rule 4–253 covers the subject of "Joint or Separate Trials." Subsection (a) deals with the "Joint Trial of Defendants":

> On motion of a party, the court may order a joint trial for two or more defendants charged in separate charging documents if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Subsection (b) deals with the parallel problem of the "Joint Trial of Offenses":

> If a defendant has been charged in two or more charging documents, either party may move for a joint trial of the charges. In ruling on the motion, the court may inquire into the ability of either party to proceed at a joint trial.

Subsection (c) provides a remedy when it appears that there may be a "Prejudicial Joinder":

> If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents, or defendants, the court may, on its own initiative or on motion of any party, order separate trials of counts, charging documents, or defendants, or grant any other relief as justice requires.

The joinder/severance problem is a classic aspect of the law of criminal procedure. *See, e.g.,* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* Ch. 17 "The Scope of the Prosecution: Joinder and Severance," (1984). Unlike the merely evidentiary issue of when, in the course of an ongoing trial, to admit evidence of "other crimes" or "other bad acts," the joinder/severance issue must be resolved, of necessity, pretrial. The evidentiary problem, by contrast, may arise randomly throughout the course of a trial.

*McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977), was the first sophisticated and in-depth analysis we have ever had in Maryland of joinder/severance law. Judge Levine there pointed out, 280 Md. at 608–609, 375 A.2d 551, how the Maryland rule (now Maryland Rule 4–253, formerly Maryland Rule 745) is patterned on Rule 14 (and Rule 8) of the Federal Rules of Criminal Procedure and how that mutual standard "is merely a restatement of the test applied at common law." 280 Md. at 608, 375 A.2d 551. *See Simmons v. State,* 165 Md. 155, 165–166, 167 A. 60 (1933); *Wanzer v. State,* 202 Md. 601, 608, 97 A.2d 914 (1953); *State v. McNally,* 55 Md. 559, 563–564 (1881); *State v. Bell,* 27 Md. 675, 678 (1867); *McElroy v. United States,* 164 U.S. 76, 80–81, 17 S.Ct. 31, 32–33, 41 L.Ed. 355 (1896); *Pointer v. United States,* 151 U.S. 396, 403, 14 S.Ct. 410, 412–13, 38 L.Ed. 208 (1894).

The progeny of *McKnight* now includes *Lebedun v. State,* 283 Md. 257, 390 A.2d 64 (1978); *State v. Jones,* 284 Md. 232, 395 A.2d 1182 (1979); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980); *Graves v. State,* 298 Md. 542, 471 A.2d 701 (1984); *Osburn v. State,* 301 Md. 250, 482 A.2d 905 (1984); *State v. Edison,* 318 Md. 541, 569 A.2d 657 (1990); *State v. Kramer,*

318 Md. 576, 569 A.2d 674 (1990); and *Frazier v. State,* 318 Md. 597, 569 A.2d 684 (1990).

The decisions of this Court following the *McKnight* analysis include *Shingleton v. State,* 39 Md.App. 527, 387 A.2d 1134, *cert. denied,* 283 Md. 738 (1978); *Ellerba v. State,* 41 Md.App. 712, 398 A.2d 1250 (1979); *Stevenson v. State,* 43 Md.App. 120, 403 A.2d 812 (1979); *Erman v. State,* 49 Md.App. 605, 434 A.2d 1030 (1981); *Epps v. State,* 52 Md.App. 308, 450 A.2d 913 (1982); *Samuels v. State,* 54 Md.App. 486, 459 A.2d 213 (1983); *Sye v. State,* 55 Md.App. 356, 468 A.2d 641 (1983); *McKinney v. State,* 82 Md.App. 111, 570 A.2d 360 (1990); *Moore v. State,* 84 Md.App. 165, 578 A.2d 304 (1990); *Cook v. State,* 84 Md.App. 122, 578 A.2d 283 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991); *Marks v. State,* 84 Md.App. 269, 578 A.2d 828 (1990); *Manuel v. State,* 85 Md.App. 1, 581 A.2d 1287 (1990); *cert. denied,* 322 Md. 131, 586 A.2d 13 (1991); *Kearney v. State,* 86 Md.App. 247, 586 A.2d 746, *cert. denied,* 323 Md. 34, 591 A.2d 250 (1991); *Ogonowski v. State,* 87 Md.App. 173, 589 A.2d 513, *cert. denied,* 323 Md. 474, 593 A.2d 1127 (1991); *Eiland v. State,* 92 Md.App. 56, 607 A.2d 42 (1992), *rev'd on other grounds sub nom. Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993); *Wieland v. State,* 101 Md.App. 1, 643 A.2d 446 (1994).

This entire line of cases concerns the joinder/severance procedural question and not the admissibility of evidence of "other crimes" or "other bad acts." Joinder/severance law, to be sure, would never be concerned with "other bad acts" in any event, for one does not go on trial, jointly or severally, for a "bad act."

### Evidence of "Other Crimes"

As a distinct body of law, the inadmissibility of "other crimes" evidence to show a criminal propensity contrasted with the admissibility of such evidence to show such matters as motive, intent, absence of mistake, identity, common scheme or plan, criminal signature in terms of modality, etc., is classic grist for the law of evidence. *See, e.g.,* Lynn

McLain, *Maryland Practice: Maryland Evidence,* § 404.5 at 352–357 (1987); Joseph F. Murphy, Jr., *Maryland Evidence Handbook,* § 518(E) at 181–196 (1989); C. McCormick, *Evidence,* § 190 at 557–565 (E. Cleary 3d ed.) (1984); 2 *Wigmore on Evidence,* ch. 13, *Other Offenses or Similar Acts, as Evidence of Motive, Design, or Intent,* at 235–378 (Chadbourne rev. 1979).

There is a substantial and distinct body of case law dealing with this evidentiary question. The leading opinions are *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976); *Cross v. State,* 282 Md. 468, 386 A.2d 757 (1978); *Straughn v. State,* 297 Md. 329, 465 A.2d 1166 (1983); *State v. Faulkner,* 314 Md. 630, 552 A.2d 896 (1989); *Harris v. State,* 324 Md. 490, 597 A.2d 956 (1991); *Terry v. State,* 332 Md. 329, 631 A.2d 424 (1993); *Anaweck v. State,* 63 Md.App. 239, 492 A.2d 658, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985).

The definitive analysis is the outstanding opinion of Judge Adkins in *State v. Faulkner.* It was *Faulkner* that prescribed for the first time the procedural steps that must be taken before a trial judge rules evidence of "other crimes" to be admissible. Judge Adkins pointed out that the first determination—whether the evidence fits within a legitimate exception to the rule of presumptive exclusion—is a legal determination not calling for any exercise of discretion:

> When a trial court is faced with the need to decide whether to admit evidence of another crime—that is, evidence that relates to an offense separate from that for which the defendant is presently on trial—it first determines whether the evidence fits within one or more of the *Ross* exceptions. That is a legal determination and does not involve any exercise of discretion. (citations omitted).

314 Md. at 634–635, 552 A.2d 896.

The second procedural step calls for preliminary fact finding by the trial judge. The allusion to some other crime allegedly committed by the defendant may be no more than a bald and unsubstantiated assertion by the witness. The alleged crime may never have led to an arrest, let alone a conviction.

Indeed, it may never have been investigated or even discovered. It is for that reason that the trial judge needs to be persuaded, by the clear and convincing standard, that the alleged crime did, indeed, take place before he allows evidence of it to come into evidence. Judge Adkins explained:

> If one or more of the exceptions applies, the next step is to decide whether the accused's involvement in the other crimes is established by clear and convincing evidence. We will review this decision to determine whether the evidence was sufficient to support the trial judge's finding. (citations omitted).

314 Md. at 635, 552 A.2d 896. Because the weight to be given the preliminary evidence as to the existence of the other crime is of necessity for the trial judge in his ancillary fact-finding capacity, the reviewing court, under the clearly erroneous standard, is limited to determining the existence of a *prima facie* case in that regard.

The third step for the trial judge is discretionary. Even when the first two hurdles have been cleared, the judge must still weigh the necessity for and probative value of "other crimes" evidence against any undue prejudice that it may cause the defendant:

> If this requirement is met, the trial court proceeds to the final step. The necessity for and probative value of the "other crimes" evidence is to be carefully weighed against any undue prejudice likely to result from its admission. This segment of the analysis implicates the exercise of the trial court's discretion. (citations omitted).

314 Md. at 635, 552 A.2d 896.

■ This, then, is the procedure to be followed when a trial judge makes an evidentiary ruling on whether to admit evidence of "other crimes." It is a procedure, however, that has no applicability to the joinder/severance issue and no proper place, therefore, in any joinder/severance analysis. There is a substantive overlap between the two bodies of law, but no procedural overlap.

### *The Limited Substantive Overlap*

In *McKnight v. State,* 280 Md. 604, 375 A.2d 551 (1977), Judge Levine broke new ground in two respects. All of the preceding case law had spoken of the joinder/severance question as one entrusted to the broad discretion of the trial judge. It was unclear, however, what limits, if any, there might be on the exercise of that discretion.

Judge Levine pointed out that "[t]wo lines of authority have emerged from the cases seeking to reconcile the conflicting considerations of prejudice and economy within the framework of discretion accorded the trial judge." 280 Md. at 610, 375 A.2d 551. One line of cases held that "a severance should be ordered where there has been a joinder of similar but unrelated offenses, if the evidence as to each crime would not be mutually admissible at separate trials." *Id.* He then pointed out that "[a]nother line of cases has taken a different position." *Id.* That second position vested continuing discretion in the trial judge to join separate charges for trial even where the evidence would not be mutually admissible, if it appeared that the jury would " 'be able to treat the evidence relevant to each charge separately and distinctly.' " 280 Md. at 611, 375 A.2d 551, *quoting Drew v. United States,* 331 F.2d 85, 91–92 (D.C.Cir.1964).

The first ground-breaking step taken by the *McKnight* decision was to hold that, in a jury trial at least, severance was absolutely mandated, as a matter of law, when the evidence with respect to the separate charges (or, presumably, with respect to separate defendants) would not be mutually admissible. In a jury trial, on this issue no discretion remains. In *Graves v. State,* 298 Md. 542, 471 A.2d 701 (1984), Judge Orth characterized the significance of the *McKnight* decision in this regard, 298 Md. at 545–546, 471 A.2d 701:

> *The McKnight holding took away the discretion of the trial judge* presiding at a jury trial to join similar offenses where the evidence as to them was not mutually admissible. As we have indicated, in such circumstances, *there was prejudice as a matter of law which compelled separate*

*trials.* The rationale underlying the *McKnight* holding was our concern that a jury would be unable to set aside the likely prejudice engendered by the joinder. (emphasis supplied).

In *Kearney v. State,* 86 Md.App. 247, 586 A.2d 746, *cert. denied,* 323 Md. 34, 591 A.2d 250 (1991), Chief Judge Wilner similarly described the impact of *McKnight,* 86 Md.App. at 253, 586 A.2d 746:

> [I]n a jury trial, "a defendant charged with similar, but unrelated offenses is *entitled* to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials." Indeed, where the evidence at a joint jury trial is not mutually admissible because of "other crimes" evidence, there is prejudice as a matter of law which compels separate trials. (citation omitted) (emphasis in original).

*See also Frazier v. State,* 318 Md. 597, 608–609, 569 A.2d 684 (1990); *State v. Jones,* 284 Md. 232, 239, 395 A.2d 1182 (1979); *McKinney v. State,* 82 Md.App. 111, 119, 570 A.2d 360 (1990); *Samuels v. State,* 54 Md.App. 486, 491, 459 A.2d 213 (1983). In a court trial, by way of significant contrast, discretion still remains in the trial judge to deny a severance even though evidence as to separate charges or separate defendants is not mutually admissible. *Graves v. State,* 298 Md. 542, 544–550, 471 A.2d 701 (1984).

The second big step taken by the *McKnight* decision was the one that created the partial substantive overlap between joinder/severance law and "other crimes" evidence law. In a jury trial at least, the mutual admissibility of evidence had become the necessary precondition for ordering the joinder for trial of separate defendants or separate charges. To determine the admissibility of evidence, mutual or otherwise, the trial judge must look to the appropriate part of the law of evidence. A determination of mutual admissibility, after all, consists of two determinations of one-directional admissibility.

In the context of joinder/severance, moreover, the subject matter of the charges against a separate defendant or of

separate charges against the same defendant is, by definition, "other crimes." To determine mutual admissibility, therefore, the judge has to look to the circumstances under which evidence of "other crimes" would be admitted in the trial of a single defendant on a single charge. *McKnight v. State* itself looked to *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976) for evidentiary guidance. Today, we look to the whole line of cases, represented most prominently by *Ross v. State, Cross v. State,* 282 Md. 468, 386 A.2d 757 (1978); *State v. Faulkner,* 314 Md. 630, 552 A.2d 896 (1989); and *Harris v. State,* 324 Md. 490, 597 A.2d 956 (1991). Unremarkably, when joinder/severance law faces an evidentiary problem, it naturally looks to the law of evidence for the solution.

The two different bodies of law, however, only overlap to this limited extent. Even substantively, joinder/severance law only looks to the law of evidence, of necessity, where the consolidated case is to be a jury trial and where mutual admissibility is thus required. If the consolidated case is to be a court trial, mutual admissibility is not an absolute requirement for joinder and this particular branch of the law of evidence is not automatically engrafted onto the joinder/severance decision. *A fortiori,* the *procedural* aspects of severance/joinder law do not subsume the *procedural* aspects of "other crimes" evidence law, for the two settings are, procedurally, totally dissimilar.

### The Procedural Non–Overlap

It is here, however, that an uncritically drawn and false analogy has worked some recurring mischief. Joinder/severance determinations frequently look to the *Ross–Cross–Faulkner–Harris* line of cases for evidentiary guidance. That, however, by no means suggests that they should, as a Pavlovian response, look to that line of cases, particularly *State v. Faulkner,* for procedural guidance. *Faulkner* purported to do no more than set out a series of procedural steps that should be taken to determine the admissibility of "other crimes" and "other bad acts" evidence in the context of a single charge against a single defendant. It was not considering in any way,

let alone prescribing for, the very different problem of join-der/severance.

The first necessary step discussed by *Faulkner* is the purely substantive determination of whether evidence of another crime is *prima facie* admissible, singly or mutually, by virtue of its utility to prove motive, intent, absence of mistake, identity, common scheme or plan, etc. It is here that the evidence law is indistinguishable from joinder/severance law, at least in the context of a jury trial, and the identity between the respective legal analyses is a true one. The *McKnight* line of cases and the *Ross–Faulkner* line of cases are dealing with precisely the same evidentiary phenomenon.

■ It is at that point, however, that *Faulkner*'s three-step analysis turns from substantive to procedural matters and at that point that the overlap ends. The second step prescribed by *Faulkner* is for the trial judge "to decide whether the accused's involvement in the other crimes is established by clear and convincing evidence." 314 Md. at 634, 552 A.2d 896. In the context of the trial of a single charge, such a requirement is appropriate and necessary. Some underworld acquaintance of a defendant, now turned State's witness, may be seeking to toss into the trial gratuitous insinuations of crime from "out of the blue." It may be some oblique reference or wild charge as to his and the defendant's having been "involved in the rackets together" or having "pushed dope together" an indeterminate number of years before. Such unsubstantiated references, moreover, may have resulted in neither convictions nor trials nor indictments nor arrests nor even reports of crime. Obviously, the judge should make some screening decision as to the reliability or trustworthiness of such allusions to other crimes before permitting them to influence, and perhaps to contaminate, the jury.

In the joinder/severance situation, by contrast, there is no such problem. All crimes charged, and, therefore, amenable to the possible joinder, are the considered products of grand jury indictments or criminal informations. Between the arrest and the trial table, two or three screening procedures have

already been satisfied. The joinder/severance problem is not that of the careless, malicious, or loose-lipped witness.

In the purely evidentiary setting, moreover, there is a clearly identifiable criminal charge that is the centerpiece of the trial and the so-called "other crime" is merely a peripheral incident, perhaps never to be received in evidence in that or any other trial. In the joinder/severance situation, by contrast, all the criminal charges involved are of equal stature. In the joinder context, who is to say which is the base crime and which is merely the "other crime?"

It was of this false analogy between the two bodies of law that we spoke in *Wieland v. State,* 101 Md.App. 1, 643 A.2d 446 (1994):

> The second step in testing "other crimes" evidence, according to *Faulkner,* is for the State to convince the trial judge by the clear and convincing standard of persuasion that the other crimes, indeed, occurred. The mutual admissibility test for joint jury trials does not include any such threshold requirement. Indeed, it would virtually require the State to prove each of its two sets of charges to the judge outside the presence of the jury before proceeding to the joint trial before the jury. *A fortiori,* there is no such step required for a joint *nonjury* trial, where mutual admissibility is not even an absolute requirement. *State v. Graves,* 298 Md. 542, 546–550, 471 A.2d 701 (1984). Nor does severance/joinder law have any enhanced standard of persuasion as a precondition to evidentiary admissibility.

If the appellant's contention were correct that such a preliminary assessment of evidentiary substance were required on the part of Judge Levitz, how could it possibly work? Would Judge Levitz be required, before denying the severance, to find as a fact that the charges 1) with respect to Pam Basu, 2) with respect to Grace Lagana, and 3) with respect to Laura Ann Becraft were *all* proved, to his satisfaction, by the clear and convincing standard of persuasion? Would not that require a mini-trial to be conducted before going forward with the ultimate trial on the merits? It would not be simply

another, possibly redundant, preliminary hearing, for a preliminary hearing only requires satisfying a probable cause standard and not clear and convincing persuasion. In the evidentiary context, moreover, a witness is there before the court under oath and on the stand. That witness may readily be examined and evaluated outside the presence of the jury and the judge, thereby, will have something before him that may persuade him of the thing to be proved.

In the pretrial setting of a joinder/severance hearing, by contrast, there are no witnesses to give the evidence necessary to persuade the judge of anything by any standard of persuasion. Suppose, moreover, Judge Levitz ultimately were *not*, by any modality, clearly and convincingly persuaded that *any* of the crimes had occurred? Should he then dismiss charges, notwithstanding the determination on the part of other institutions to bring charges? Hardly. It is obvious that *Faulkner*'s procedural screening, salutary in the context of an evidentiary ruling, has no applicability to a pretrial hearing on joinder or severance.

The third step prescribed by *Faulkner* is that the trial judge assess the "necessity for and probative value of the 'other crimes' evidence" and then "carefully weigh [it] against any undue prejudice likely to result from its admission." 314 Md. at 635, 552 A.2d 896. That particular weighing exercise would also be inapplicable to a joinder/severance determination. In severance determinations, to be sure, the judge retains discretion to order severance even after a finding of mutual admissibility. The possible prejudice to a defendant from a joint trial is one of the factors there to be weighed. There is, nonetheless, a vast qualitative difference between the two weighing operations. One such weighing operation compares a product with apples whereas the second such weighing operation compares that product with oranges. Self-evidently, the two comparisons are not the same.

In the evidentiary context, *undue prejudice* is weighed against *the necessity for and probative value of the evidence*. Those two values compete only with each other and on an

essentially level playing field, with the slight tilt, if any, going in favor of protecting a defendant from prejudice. The interest of judicial economy, it must be carefully noted, is not any part of that weighing process. Indeed, there would be no way for it to be a factor. Receiving "other crimes" evidence does not conserve precious judicial resources; neither does rejecting such evidence squander those resources. The rejection of the evidence at the trial in question will not entail an additional trial. As we explained in *Wieland v. State,* 101 Md.App. at 16, 643 A.2d at 453:

> There is no downside to keeping out evidence of "other crimes" for the other crimes are not the subjects of pending trials.

> ·   ·   ·   ·   ·

> When a severance is granted, an additional trial becomes necessary and witnesses may well be called back to the courthouse for a repeat performance. When in the context of a single trial, on the other hand, "other crimes" evidence is excluded, no such costs are incurred.

Unlike the merely evidentiary call, where the concern for judicial economy has no weight in whether to admit or reject evidence, judicial economy is a heavy counterweight on the joinder/severance scales. As Judge Levine pointed out in *McKnight,* 280 Md. 604, 608–609, 375 A.2d 551 (1977):

> The rationale traditionally offered to justify joinder of similar offenses is that a single trial effects an economy, by saving time and money, to the prosecution, the defendant, and the criminal justice system. (footnote omitted).

In *Jennings v. State,* 8 Md.App. 312, 317, 259 A.2d 543 (1969), Chief Judge Murphy (now Chief Judge of the Court of Appeals) spoke in similar terms:

> [O]ne of the considerations in denying separate trials is to save [the] time and expense they would entail.

In *Cook v. State,* 84 Md.App. 122, 130, 578 A.2d 283 (1990), Judge Bloom stated for this Court that "joinder of defendants [and charges] for trial is favored for reasons of judicial economy." He continued:

Thus, the question for the trial court is whether the need for judicial economy in conserving time and resources of the court and witnesses outweighs the prejudicial effect of the evidence. *McKnight v. State*, [280 Md. 604, 608, 375 A.2d 551 (1977).]

The law of evidence, per *Faulkner*, prescribes a mandatory weighing operation. The joinder/severance law, per *McKnight*, suggests a permissible weighing operation. The two weighing operations are designed, however, to make very different comparisons. The *evidentiary* weighing operation measures prejudice in comparison with apples and with apples only. The *joinder/severance* weighing operation, by contrast, measures prejudice against oranges or, perhaps, even against apples and oranges combined. In any event, the weighing of competing factors spelled out by *Faulkner* for an evidentiary ruling is not appropriate for a joinder/severance determination.

### The Subcontentions in this Case

Against this legal backdrop, it becomes obvious that several of the appellant's subcontentions must be rejected for their failure to state a cognizable joinder/severance claim.

### A. No Clear and Convincing Proof of "Other Crimes"

The "clear and convincing" proof test, taken from *Faulkner*, is, as we have discussed, no part of joinder/severance law. We do not even say that the subcontention lacks merit. It is rather that there is no way to measure its merit or demerit. We are not reviewing an evidentiary ruling. The claim is simply beside the point in the context of reviewing a joinder/severance decision.

### B. Probative Value Versus Potential Prejudice

Once again, a weighing of probative value versus potential prejudice, taken from *Faulkner*, is no significant part of joinder/severance law. For joinder/severance purposes, we measure the potential for prejudice not merely against probative value but primarily against the interests of judicial economy, a subject the appellant has chosen not to consider. It is,

to be sure, probative value that dictates admissibility *in the evidentiary context*, a context not involved in this case. It is not, however, probative value that dictates *joinder.* It is judicial economy. Even if we were to concede, simply for the sake of argument, that the potential prejudice to the appellant from joining for trial the three criminal incidents in this case outweighed the necessity for or probative value of the evidence of each incident to the proof of the others, that would have but minimal impact on our review of the trial joinder in this case. Judicial economy may readily "trump" the other concerns.

Indeed, we have found no Maryland decision where, once the initial hurdle of mutual admissibility has been cleared, a decision by a trial judge to order a trial joinder has ever been held to be an abuse of discretion.[1] Many of the opinions, moreover, decline to include within the definition of "prejudice" the legitimate damage to a defendant's cause that is incurred when *admissible* evidence is received against him. In *Osburn v. State*, 301 Md. 250, 254–255, 482 A.2d 905 (1984), Judge Couch observed for the Court of Appeals:

> Initially we note that the evidence offered by the state was mutually admissible against both Winters and Osburn. Thus the fact that this evidence may have been prejudicial to Osburn does not dictate that he was entitled to be tried separately from Winters. As Judge Liss said for the court

---

1. *Erman v. State*, 49 Md.App. 605, 612–616, 434 A.2d 1030 (1981) is readily distinguishable. That case involved not the joinder for trial of separate charges against a single defendant, but the more unpredictable joinder for trial of separate defendants. When, in the course of the trial, there were repeated instances of damaging evidence being admitted against a codefendant which would not, in a separate trial, have been admissible against Erman, we held that the accumulation of unanticipated prejudicial evidence created a situation where the appellant was entitled to the declaration of the mistrial. Even there, however, we held that the initial pretrial denial of the severance had not been an abuse of discretion but that unanticipated events made a subsequent declaration of a mistrial manifestly necessary. The *Erman* situation, in the last analysis, dealt with unanticipated evidence that was *not* mutually admissible. By contrast, we are here discussing the balancing that takes place only *after the evidence* in question *has cleared the mutual admissibility hurdle.*

in *Sye v. State,* 55 Md.App. 356, 362, 468 A.2d 641, 644 (1983), *"[p]rejudice as a term of art means damage from inadmissible evidence, not damage from admissible evidence.* (emphasis supplied).

In *Ogonowski v. State,* 87 Md.App. 173, 186–187, 589 A.2d 513, *cert. denied,* 323 Md. 474, 593 A.2d 1127 (1991), Judge Rosalyn Bell, in affirming a trial judge's decision to deny severance, discussed the subject of prejudice:

> "The exercise of that discretion requires balancing the "prejudice" caused by the joinder against "the considerations of economy and efficiency in judicial administration."
>
> *"Prejudice" within the meaning of Rule 4–253 is a "term of art," and refers only to prejudice resulting to the defendant from the reception of evidence that would have been inadmissible against that defendant had there been no joinder.* (citation omitted) (emphasis supplied).

In *Cook v. State,* 84 Md.App. 122, 130, 578 A.2d 283 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991), Judge Bloom confirmed that prejudice at a joint trial does not consist of damage from evidence that would have been admissible in any event even had the trials of the defendants or charges been severed:

> Here, there was no prejudice to either appellant in the refusal to sever their trials on the charges lodged against them jointly. Any evidence that was admissible against either appellant on *those* charges would be admissible against both. (emphasis in original).

In *Moore v. State,* 84 Md.App. 165, 169, 578 A.2d 304, *cert. denied,* 321 Md. 385, 582 A.2d 1256 (1990), Chief Judge Gilbert analyzed the subject of prejudice in precisely the same way:

> *A defendant is deemed to have been prejudiced by a joint trial when the joining* of a co-defendant or co-defendants (1) *permits the State to introduce, against a particular defendant, otherwise inadmissible evidence,* and (2) that otherwise admissible evidence tends to contradict the defendant's theory of the case. (emphasis supplied).

In this case, however, it is not necessary to hold that Judge Levitz did not abuse his discretion in deeming the interests of judicial economy to outweigh those of potential prejudice because the appellant has not even asked us to review that particular weighing operation or exercise of discretion.

## C. *Mutual Admissibility*

What remains as the very pertinent issue for appellate review is the single subcontention that the evidence with respect to the three criminal incidents was not mutually admissible. This involves the substantive law of evidence. This is the one area where the procedural law of joinder/severance and the evidentiary law of "other crimes" do, indeed, overlap.

The three leading cases on what evidence of "other crimes" would be admissible in the trial of a single charge against a single defendant, and by analogy would be mutually admissible where multiple charges or multiple defendants are being joined for trial, are *Ross v. State*, 276 Md. 664, 350 A.2d 680 (1976); *State v. Faulkner*, 314 Md. 630, 552 A.2d 896 (1989); and *Harris v. State*, 324 Md. 490, 597 A.2d 956 (1991). It is the *Harris* case that puts the whole subject of "other crimes" admissibility into proper perspective, disabusing us of the false but prevalent idea that there is a finite number of rigidly policed categories of admissible "other crimes" evidence.

In *Harris v. State*, 81 Md.App. 247, 567 A.2d 476 (1989), this Court had argued for an "inclusionary" statement of the "other crimes" evidence law. The Court of Appeals, speaking through Judge McAuliffe, rejected that approach in favor of the "exclusionary" statement of the law. The difference between the two approaches was not one of substance. It was a difference, rather, of emphasis, of attitude, and of allocating the burden on the issue to the proponent rather than to the opponent of the "other crimes" evidence. Almost all evidence that would be clearly accepted under one approach would also be accepted under the other. Almost all evidence that would clearly be rejected under one approach would also be rejected under the other. The difference in "tilt," however, might well

be a critical difference with respect to borderline cases. Judge McAuliffe pointed out that the difference was essentially semantic, 324 Md. at 494, 597 A.2d 956:

We have re-examined the principles governing admissibility of evidence of other bad acts and have considered the current legal literature discussing the "inclusionary" and "exclusionary" approaches to the problem. We recognize that in some respects the question involves semantics—more particularly, how one defines the "rule" that shall ordinarily govern.

The inclusionary statement of the rule would say, in effect, "ALL RELEVANT 'OTHER CRIMES' EVIDENCE COMES IN, UNLESS IT IS RELEVANT ONLY TO SHOW CRIMINAL PROPENSITY." The exclusionary statement of the rule would say, in effect, "ALL RELEVANT 'OTHER CRIMES' EVIDENCE STAYS OUT, UNLESS IT IS SUBSTANTIALLY RELEVANT TO SHOW SOMETHING OTHER THAN CRIMINAL PROPENSITY." The difference is, indeed, simply one of tilt or attitude.

In a very balanced and fair presentation of the competing arguments, Judge McAuliffe recognized, 324 Md. at 498, 597 A.2d 956, certain virtues in the inclusionary approach:

The inclusionary approach has a certain appeal and a logical basis. It recognizes that evidence of other bad acts usually has some relevance and that relevant evidence is usually admitted unless some good reason is shown to exclude it.

On balance, however, the Court of Appeals concluded that the exclusionary approach was more efficacious in emphasizing that the burden should properly be cast on the proponent to demonstrate that "substantial relevance for some other purpose" outweighs the potential prejudice inherent in the inevitably attendant revealing of criminal propensity. Judge McAuliffe reasoned, 324 Md. at 500–501, 597 A.2d 956:

[P]erhaps more compelling in our choice of the approach most likely to produce a just result, is the need to ensure that adequate consideration be given to the conceded, but

sometimes overlooked, potential for unfair prejudice that invariably accompanies the introduction of evidence of other bad acts. The exclusionary form of the rule clearly serves to remind the bench and bar that, unlike most other evidence, this evidence carries with it heavy baggage that must be closely scrutinized before admissibility is warranted. Finally, by employing the exclusionary approach, it is immediately clear that the party offering the evidence has a hurdle to overcome and must shoulder the burden of demonstrating relevance other than criminal character, as well as the burden of demonstrating that the probative value substantially outweighs the potential for unfair prejudice.

Judge McAuliffe then effectively pointed out a flaw in the approach taken by this Court, as he pointed out that one of our biggest fears of the exclusionary approach was illusory. Our argument against the exclusionary approach was premised, in significant part, on the perceived absurdity of a neat "laundry list" of exceptions. We had argued, 81 Md.App. at 280, 567 A.2d 476:

Inherent in this [inclusionary] approach is the rejection of any notion that there is a finite list of neatly compartmentalized "exceptions." *What have been called "exceptions" are but illustrations of some of the more familiar relevant purposes other than the showing of propensity.* Indeed, the conceptualization of legitimate evidentiary uses as fitting into a small group of mutually exclusive compartments serves only to confuse rather than to facilitate understanding. Proof of motive, for instance, is almost invariably proof of intent as well. Proof of intent, in turn, is *ipso facto* proof of knowledge and is also disproof of accident or mistake. Proof of intent may also prove a plan or design and vice versa. *The very idea of a lengthy, albeit neat and tidy, laundry list of purposes is an absurdity* when the only pertinent question needs to be whether the evidence is relevant to prove guilt in some way other than by showing propensity. (emphasis supplied) (citations and footnotes omitted).

Judge McAuliffe reassuringly pointed out that that fear and criticism was ill-founded and that the exclusionary statement of the rule, reconfirmed in Maryland, was not inhospitable to otherwise relevant evidence simply because it did not fit into a preexisting pigeonhole:

> The intermediate appellate court pointed out that a potential vice of the exclusionary approach is that it suggests the existence of a finite number of "exceptions" to inadmissibility and that unless a proposed item of evidence can be matched with one of the exceptions it cannot be admitted. As we shall endeavor to make clear, *admissibility of evidence of other bad acts is not confined to a finite list of exceptions, even under the exclusionary rule.* (emphasis supplied).

324 Md. at 497, 597 A.2d 956.

If not to serve as a closed and finite list, what then is the function of the familiar "exceptions" to the exclusionary rule against "other crimes" evidence? Judge McAuliffe pointed out, 324 Md. at 497–498, 597 A.2d 956, that they are *helpful* as quick reference points and familiar guidelines:

> Evidence of other acts that has sufficient relevance, other than merely by showing criminal character, may be admissible. *The so-called exceptions are helpful as classifications of those areas where evidence has most often been found admissible* even though it discloses other bad conduct, *enabling the bar and bench to quickly focus* upon the areas most likely to be involved. (emphasis supplied).

On any list of the representative or illustrative types of issues that have regularly been found to possess substantial relevance, the first rank invariably consists of the quintet brought to the front of the mind by the mnemonic aid MIMIC:

1. MOTIVE
2. INTENT
3. Absence of MISTAKE or accident
4. IDENTITY
5. COMMON scheme or plan

*Harris v. State,* 324 Md. at 501, 597 A.2d 956; *State v. Faulkner,* 314 Md. at 634, 552 A.2d 896; *Ross v. State,* 276 Md. at 669–670, 350 A.2d 680.

Those five, however, are by no means the only entries one finds even on the most ordinary of listings. Without benefit of mnemonic device, some of the other "regulars" are:

6. When several offenses are so connected in point of time or circumstances that one cannot be fully shown without proving the other. *Ross v. State,* 276 Md. at 670, 350 A.2d 680; *Tichnell v. State,* 287 Md. 695, 712, 415 A.2d 830 (1980).

7. Where the "other crime" tends to show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial. *Berger v. State,* 179 Md. 410, 414, 20 A.2d 146 (1941); *Ross v. State,* 276 Md. at 670, 350 A.2d 680; *Vogel v. State,* 315 Md. 458, 465, 554 A.2d 1231 (1989); *Acuna v. State,* 332 Md. 65, 72–76, 629 A.2d 1233 (1993).

8. "[P]rior criminal conduct … may be admitted … to show consciousness of guilt." *State v. Edison,* 318 Md. 541, 547, 569 A.2d 657 (1990).

9. "[O]ther like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused." *Ross,* 276 Md. at 670, 350 A.2d 680. Whereas *Ross* treats this use of a peculiar *modus operandi* or "signature" as an exception in its own right, *State v. Faulkner,* 314 Md. at 638–640, 552 A.2d 896, treats it merely as a variety or aspect of the "identity" exception. This minor difference of opinion in conceptualization makes the larger point—that it is relevant evidence on a material issue in any event, regardless of how one categorizes or conceptualizes it.

With the passing years, the list of representative examples continues to grow. Taking their cue from Federal Rule of Evidence 404(b), the recent cases now routinely list as recognized exceptions:

10. Opportunity

11. Preparation

12. Plan

13. Knowledge

*State v. Faulkner,* 314 Md. at 634, 552 A.2d 896; *State v. Edison,* 318 Md. at 547, 569 A.2d 657; *Harris v. State,* 324 Md. at 501 n. 3, 597 A.2d 956.

The ever-growing list of illustrative examples or "exceptions" fulfills the prediction we made in *Anaweck v. State,* 63 Md.App. 239, 257, 492 A.2d 658, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985):

> These five examples of relevance given by *Ross* and repeated by all of its progeny do not exhaust the category; *it is an open-ended list always capable of expansion wherever a clear instance of relevance might arise that somehow fails to fit neatly into one of the pigeonholes.* (emphasis supplied).

*State v. Edison,* 318 Md. at 547, 569 A.2d 657, recognized the same open-ended nature of the evidentiary category:

> [E]xceptions to the general rule are not limited to those noted in *Ross; the Ross exceptions are not exclusive.* (emphasis supplied).

In *Harris v. State,* 324 Md. at 501, 597 A.2d 956, Judge McAuliffe emphatically underscored this same essential characteristic:

> We reinforce a point we have previously made—that *the recognized "exceptions" to the exclusionary rule are not exclusive. ... This is a representative list* of examples in which evidence has been found to meet the exception to the general rule of exclusion; *it is not a laundry list of finite exceptions.* (footnote omitted) (emphasis supplied).

With the acknowledged tilt in favor of exclusion over inclusion, the bottom line remains as expressed by Judge Adkins in *State v. Faulkner,* 314 Md. at 634, 552 A.2d 896:

> Evidence of other crimes may be admitted, however, if it is substantially relevant to some contested issue in the case and if it is not offered to prove the defendant's guilt based

on propensity to commit crime or his character as a criminal.

Thus measured, is the evidence with respect to the three crimes perpetrated against the three victims in this case mutually admissible? Is it, when transferred from the proof of one crime or set of crimes to proof of the others, "substantially relevant for reasons other than proof of criminal character?" *Harris v. State,* 324 Md. at 500, 597 A.2d 956. Does it "transcend ... mere evidence of bad character?" *Id.* at 498, 597 A.2d 956. We hold that it does.

### *The Grace Lagana Incident*

Grace Lagana was the first of the victims at a few minutes after 8 A.M. on September 8, 1992. She had just arrived for work as the administrative supervisor of the tourist information center at a rest area on northbound Interstate 95. The rest stop is at Mile Marker 37, which is between Route 216 and Route 32. She had parked her 1989 Chrysler LeBaron at her usual spot on the parking lot and then walked around to her passenger door to retrieve some paperwork, several file folders, and her purse.

The appellant and Bernard Miller, meanwhile, had had the Cadillac, in which they were returning to Washington with two other individuals, run out of gas along southbound I–95 across the road from the rest stop. The appellant and Bernard Miller went foraging for gasoline or for alternative transportation.

Grace Lagana, as she stood by her open passenger door, sensed the two men approach from her rear. It was the appellant who spoke, "Give me your car keys or I will blow your fucking head off." Ms. Lagana replied, "You can't have them," and held on to her key ring firmly. The appellant grabbed her right hand and the keys and engaged her in a tug of war. Ms. Lagana maintained her grip on the key ring itself, but the appellant pulled the keys loose from the ring. The appellant moved around to the driver's side, opened the door, and got in the car. Bernard Miller grabbed her wrist

and forced her to the ground in an effort to get around her and into the passenger's seat.

As Ms. Lagana was yelling for help to some people at nearby pay phones, the appellant was trying, with no success, to get the ignition started. It was the trunk key that the appellant had jammed into the ignition. As a young man came running toward the scene yelling, "Leave that lady alone and leave her car alone," both the appellant and Bernard Miller jumped out of Ms. Lagana's car and ran toward a wooded area with a residential community just beyond it. Gorman Road, just south of the rest stop, passes over I–95 and runs into the nearby residential community.

Ms. Lagana made a positive in-court identification of the appellant as her primary assailant. The fingerprints of the appellant, moreover, were found on the driver's side of Ms. Lagana's Chrysler LeBaron.

### The First Testimonial Bridge: From Grace Lagana to Laura Becraft

As the appellant and Bernard Miller fled from the parking lot of the rest stop, it was no more than 200 yards up to Gorman Road. From the I–95 overpass, it is no more than ⅗ths a mile farther east on Gorman Road to Jaclyn Court, where Laura Becraft lived. The first testimonial bridge between the Grace Lagana incident and the Laura Becraft incident was supplied in part by Susan Margaret Harkins. She was driving her two-year-old to a day-care center at approximately 8:10 A.M. She was driving westbound on Gorman Road when she noticed two young black males, one of whom she positively identified in the courtroom as the appellant, running rapidly eastbound on Gorman Road. The appellant and his companion were, when observed, about halfway between the I–95 overpass and Jaclyn Court.

The second part of that first testimonial bridge was supplied by John Bryan. He lived on Jaclyn Court immediately across the street from Laura Becraft. At approximately 8:10 A.M., he was getting ready to walk his young son to the Forest

Ridge Elementary School, less than a quarter of a mile from his home. When his son told him that two strangers were walking up the driveway, he decided not to answer the door. Through a window, he watched as the two black males walked up on the porch and rang the doorbell. When there was no response, they left within a minute or two. They walked immediately across Jaclyn Court and up the driveway belonging to Laura Becraft. Mr. Bryan observed the two men as they conversed briefly with Laura Becraft. John Bryan made a positive in-court identification of the appellant as one of the two men on Jaclyn Court at approximately 8:10 that morning.

### The Laura Becraft Incident

Laura Ann Becraft lived on Jaclyn Court. She lived, incidentally, within a few blocks of Pam Basu. That small residential community of "about fifty houses" was occupied by "mostly younger families," who "have children who are in the elementary age." Laura Becraft was just leaving home to escort her five-year-old son Ben to his kindergarten class at the nearby Forest Ridge Elementary School. Although Ms. Becraft normally left for school between 8:00 and 8:05 A.M., she was running a few minutes late on the morning of September 8. Instead of enjoying the leisure time to walk her son to school, she decided to drive. Walking or driving, it was her custom to pick up a neighbor's child, who lived about five houses away, and take him with them.

As Laura Becraft and her son were preparing to get into her car, parked in her driveway, she was approached by the appellant and Bernard Miller, who were at that point walking up her driveway. The appellant said, "I need to come in your house and use your phone." She explained that she was in a hurry to get to school and that they would have to try some other house. The appellant persisted, "No. You don't understand. I need to come into your house and use the phone. We're lost. It's an emergency." Laura Becraft continued to insist that they would have to try some other house. With that, she and her son drove off.

They only drove for a distance of five houses, however, because she had to pick up her son's classmate, Kyle, at 9502 Jaclyn Court. Laura Becraft went into Kyle's house to get him and had some difficulty getting him to tuck in his shirt and put on his jacket. As she escorted Kyle out to her waiting automobile, put him in the passenger side, and started to return to the driver's side, the appellant and Bernard Miller came rushing up to her. As she pulled back, the appellant grabbed her left wrist, saying, "Give me your keys." The two children in the car started screaming. Ms. Becraft stubbornly held onto her keys and started backing up toward 9502 Jaclyn Court. She yelled, "No, get away from me." A short struggle for the keys ensued, but Laura Becraft had her fingers through the ring and held on. The appellant clenched his fist and held it up as if to hit her. At one point, he reached down toward his waist and said, "I have a gun." Notwithstanding the threats, Laura Becraft "broke the grasp" and backed away, yelling, "Call the police. These two men attacked me."

At that point, the appellant and Bernard Miller broke off the attack, said, "Sorry, lady," and walked nonchalantly up the street. Laura Becraft lost sight of them at that point. She made a positive in-court identification of the appellant.

### The Second Testimonial Bridge: From Laura Becraft to Pam Basu

Theresa Giddings left her home, a block away from that of Laura Becraft, to walk her two children and a neighbor's child to the Forest Ridge Elementary School at 8:10 A.M. As she stood at a pedestrian crosswalk near the point where the Jaclyn Court/Jeanne Court cul-de-sac meets Gorman Road, she heard a female voice yell, "No, stop." Moments later, she saw the appellant and Bernard Miller walk from the Jaclyn Court/Jeanne Court cul-de-sac to its intersection with Gorman Road. Suspicious because they were strangers in the neighborhood, she paid close attention. As they approached her, she heard Bernard Miller ask the appellant, "What are we going to do now?" She heard the appellant reply, "Don't worry. Be cool. We will get one." As she escorted the three

children across Gorman Road, she noticed the two men "take off running" eastbound on Gorman Road. It was in that direction, approximately two blocks farther east, that Pam Basu lived. Theresa Giddings made a positive in-court identification of the appellant.

As Theresa Giddings was returning from the school a few minutes later, she saw her friend and neighbor Laura Becraft, who was waiting for the arrival of the police. Laura Becraft explained to her the events of a few minutes earlier. As they were standing there, Theresa Giddings heard, from farther east on Gorman Road, "a female scream and it was one long loud scream." Almost immediately thereafter, she "saw a flash of a car going towards 29 and it was the color of a tannish yellow."

John Bryan, the neighbor across the street from Laura Becraft, who had testified about observing the appellant and Bernard Miller at his front door and his determination not to answer it, was still looking out of his upstairs window some minutes later. After the episode between Laura Becraft and the two men had been concluded, John Bryan observed the two of them running down Gorman Road in an easterly direction, the direction of the Basu home.

The evidentiary contribution of Gary Lagola was slight, but he did represent a spatial and temporal mid-point between the Laura Becraft incident and the Pam Basu incident. He lived on Horsham Drive, a few houses away from Pam Basu. He was walking his child to the Forest Ridge Elementary School that morning when he noticed two young black men, strangers in the neighborhood, talking to a neighbor. The place where Mr. Lagola observed the two was between the Jaclyn Court home of Laura Becraft and the Horsham Drive home of Pam Basu. Mr. Lagola also explained how in that neighborhood, with various residential cul-de-sacs opening out onto Gorman Road, pedestrian distances are shorter than vehicular distances because of footpaths that connect the neighborhoods both with each other and directly with Gorman Road.

Julie Panzeri lived on Horsham Drive as the next-door neighbor of Pam Basu. It was precisely 8:25 A.M., as she was about to leave for work, that she came out of her home and observed the festive activity at the Basu household. Pam Basu was about to take her 22½ month old daughter, Sarina, for her first day in school. The father, Steve Basu, and the family's "nanny" were standing in the doorway of the home memorializing the event with a video camera. Pam Basu was standing by the passenger side of her BMW with Sarina. It was at that point that Julie Panzeri noticed two black males walking down the middle of the street. She made a positive in-court identification of the appellant as one of them. She noticed, moreover, that the appellant seemed to be observing Pam Basu very closely.

Three separate persons were witnesses with respect to both the attack on Laura Becraft and the later attack on Pam Basu. Steven Poore was taking his kindergarten son to school (the five-year-old, who was just learning to tell time, noted specifically to his father that it was 8:08 as they left the house) when he noticed two black males, the younger of whom he identified as Bernard Miller, milling about and looking at cars in the area of Jaclyn Court. It was several minutes later that he heard a woman, in the area of Jaclyn Court, yelling and screaming. When he turned to look, he saw the same two black males emerge from the cul-de-sac and run east on Gorman Road. After depositing his five-year-old at school, and stopping at the principal's office to complain about the absence of a crossing guard, he was returning home at approximately 8:20. He saw the light brown colored BMW, which turned out to be Pam Basu's, westbound on Gorman Road at a high rate of speed. It was occupied by two black males. He identified the one on the passenger side (Bernard Miller) as the younger of the two individuals he had earlier seen leaving the Jaclyn Court area.

Both Sandra Benz and Stephanie Donnelly testified that, as they were taking their children to school that morning, they noticed two black males walking eastbound on Gorman Road, coming from the direction of Jaclyn Court and going in the

direction of Horsham Drive. They both deposited their children at school and were returning home ten to fifteen minutes later when they saw the BMW speeding westbound on Gorman Road. Both of them, unlike Steven Poore, saw the body of a human being attached to the speeding vehicle and being dragged and bounced along the roadway. Sandra Benz, moreover, recognized the passenger in the BMW as the younger of the two black males she had seen ten to fifteen minutes earlier walking on Gorman Road.

### *The Pam Basu Incident*

Mercifully, Biswaneth "Steve" Basu, the owner of a small engineering company doing work for the United States Government, did not witness the grotesque murder of his wife, Dr. Pam Basu, a research scientist with the W.R. Grace Company in Columbia. Mr. Basu was a witness, however, to events just minutes before the fatal attack took place. September 8th was to have been their daughter Sarina's first day at the Montessori Preschool. Mr. Basu testified that the family was up at 6:30 A.M. to prepare for the day's activities. As Pam Basu and Sarina were preparing to leave in Pam's BMW, Mr. Basu was recording everything with his videotape camera. Mr. Basu was going to follow them to school in his own car a few minutes later, bringing the "nanny" with him so that she could familiarize herself with the route.

Ironically, as Mr. Basu was filming his wife and daughter standing in front of the wife's automobile, the video camera caught and recorded the picture of the appellant and Bernard Miller walking down the middle of Horsham Drive behind them.

Mr. Basu testified as to how Sarina was strapped into a car seat in the right rear of the automobile. He also described how it was his wife's regular practice, as "a very safe and careful driver," to come to a complete stop at the stop sign where Horsham Drive intersected Knightsbridge Road one block away. Normally, she would then have turned left on Knightsbridge Road and followed it for one block to its

intersection with Gorman Road. The last time Mr. Basu saw his wife alive was as she drove toward the intersection with Knightsbridge Road at approximately 8:25 that morning. The identification of the appellant and Bernard Miller on the videotape was clear.

Pam Basu was attacked as she stopped for the stop sign at Horsham Drive and Knightsbridge Road. There were several witnesses to the initial *corpus delicti*. They were the occupants of a truck that was approaching the same stop sign and was perhaps half a block back at the time of the initial attack. Tammy Lynn Rienstra was in the right front seat of the truck which was being driven by her live-in boyfriend David Self. Her four-year-old son was seated between them in the front of the truck. Standing in the back of the open truck were Robert Hicks, who shared a residence with them, and Tammy's six-year old son. Both boys were being delivered to Forest Ridge Elementary School at shortly before 8:30 A.M.

When Tammy Rienstra observed trouble ahead at the stop sign, her truck slowed down and then stopped. She first observed what "appeared to be a man fighting with someone in the car." She saw a second man run around to the passenger side of the car as the driver's door opened and the first man was "smacking or punching" the woman in the driver's seat. The woman was ultimately pulled out of the car and fell to the ground. As the first man got into the driver's seat, the woman ran back to the car and "the car drove away with her attached to it." As Tammy Rienstra described the scene:

> She was attached to the car. Her body was bouncing off the ground. Well first off, she was running and then there is a dip in the road and that is when her body started bouncing off the road.

She described how one of the woman's shoes was off and how "after her knees made contact" with the ground, she stopped running and "was dragged by her heels."

As the stolen BMW, dragging Pam Basu's body, continued straight ahead on Horsham Drive until it would ultimately

curve around into Gorman Road several blocks further east, the pickup truck carrying Tammy Rienstra made a left turn at Knightsbridge Road and proceeding more directly to Gorman Road, when it turned left again to drop the two children at school. Tammy Rienstra had no desire to follow the BMW because she "was scared ... and was crying." She was "worried what my kids had seen because by this time they had done seen everything and they were freaking." At the front of the school, however, she told the vice-principal to call the police. It was as she was then "trying to get my kids settled" and "standing in front of the school," that she saw the same car dragging the same body come speeding down Gorman Road, westbound right past the school. She could see that the woman "was attached to the car" and that "it looked like her arm was slammed into the door." Her body was "being dragged along the road."

Robert Hicks was riding in the back of Tammy Rienstra's pickup truck when his attention was directed to the intersection of Horsham Drive and Knightsbridge Road by the driver's yelling, "Rob! Rob!" As Robert Hicks looked ahead, he saw that the pickup had come to a stop about "eight to ten car lengths" from the back of the BMW. He observed that "two males were beating the woman through the door, through the open window of the vehicle. She was screaming." From his open position in the truck, he could hear that "she was screaming the whole time." He described how both black males were hitting her very hard. As one ran around to the passenger's side, the other was "pulling her from the driver's seat." Initially, she was holding adamantly to the steering wheel. After she was thrown to the ground, her primary attacker jumped in the driver's seat and tried to close the door.

Robert Hicks made a positive in-court identification of the appellant as that primary assailant. He went on to describe how Pam Basu jumped up from the ground and ran back to the driver's window even as the appellant was "punching her out the window, punching her in the face." The car started up as she "was holding with her arm, it looked like, in the

window." After describing continued screaming and bouncing along the road as she was dragged by the car, Hicks described her "flopping like a rag doll stuck to the side of the vehicle and blood just started flying. I still heard her screaming . . . until she went out of sight." He further described how the BMW "accelerated rapidly."

Robert Hicks also described how, as he and Tammy Rienstra were standing in front of the school, the BMW came speeding by in a westbound direction, still dragging the bouncing body of Pam Basu.

Kevin Brown was a dump truck driver who was moving north on Knightsbridge Road on the morning of September 8 and noticed the BMW stopped in the road at the point where Horsham Drive crosses Knightsbridge Road. He slowed down when he saw a male half in and half out of the driver's window and when he heard a woman scream. Immediately after clearing the intersection, he stopped and tried to observe the scene in his rear view mirror. He heard the woman screaming, "My baby." He saw the younger black male get in the passenger side of the BMW and attempt to force the woman driver out of the car by "kicking, pushing her out." The older male was on the driver's side hitting her with his fists "in her head." He was trying to pull her out as his companion attempted to push her out from the passenger side. Throughout the entire incident, the woman continued to scream loudly and to repeat, "My baby, my baby."

Kevin Brown acknowledged that he "was scared" but finally got out of his truck to approach the scene more closely. Anticipating trouble, he ran back to his truck "to get a chain out . . . to defend myself or her." As he started to return to the BMW with his chain, he noticed that the woman was then outside of the car and down on her knees. As the car started to move, she tried "to grab at the car." As the car began to move away, eastbound on Horsham Drive, the woman was still screaming. As Kevin Brown described the scene:

The door closed and she lost, her footing went out, her arm, her left arm was stretched out and the car took off,

accelerated and she lost her footing and fell down and was just being drug up the road.

From the point where it crosses Knightsbridge Road, Horsham Drive continues for three blocks until it curves up into Gorman Road. Katherine Nehring had her three children in the car at several minutes after 8:25 A.M., as she stopped before making a left-hand turn from Horsham Drive onto Gorman Road. She noticed a car coming up behind her "in a real hurry." It passed her on her left-hand side and "screeched across the intersection." As it turned, she noticed "something dragging from the car." Initially, she thought that "it looked like a dummy or a Halloween prank or something."

Not yet taking the situation too seriously, she made her left-hand turn onto Gorman Road and was proceeding toward the Forest Ridge Elementary School when she noticed that in the car that had passed her "there was a man in the back struggling with something." The car then "screeched to a stop." As she passed it, she noticed that the thing the man was struggling with in the back seat "was a baby seat." According to Ms. Nehring, "that's when I started really paying attention." She described how the baby seat was "just tossed on the road. I mean just tossed, really thrown down just like a bag of garbage or a bag of potatoes or something." As the other car sped away, Ms. Nehring noticed that there was a baby in the baby seat. As she described it:

[W]ith the force of the impact of the baby seat hitting the pavement, it landed straight up, but it flipped on its side and the baby, I could see at that point there was a child in it, and the baby stood straight up and she was right in the middle of the road.

Ms. Nehring picked up little Sarina Basu from the roadway and ultimately took her to the police.

Various police officers described being able to follow a trail of blood, of clothing, and of flesh 1.7 miles west on Gorman Road to the point where the mangled body of Pam Basu was finally disengaged from the BMW and left on the roadway.

Just before the point where the body finally came loose from the car, the driver's side of the automobile to which her body was attached had rammed into a barbed wire fence. What was left of the body was wrapped with barbed wire that had coiled around it four times.

In addition to describing the massive mutilation, the post mortem examiner also testified to the fact that Dr. Basu's left arm had gotten entangled in the safety belt and that that was what kept her body from being disengaged from the car.

When, following a high-speed chase, the BMW was finally recovered, the appellant's fingerprints were in the BMW, on the driver's side.

### Flight from the Crime Scenes

Not quite an hour went by before the police picked up the trail of the appellant and Bernard Miller. The two had driven the BMW north to Eldersburg in Carroll County, where they went to a car wash to have the blood and other evidence removed from the vehicle. Incomprehensibly, they then retraced their steps back into Howard County and to within about six miles of the crime scene. An All Points Bulletin meanwhile was out for the stolen BMW.

Maryland State Trooper Mark Price first spotted it and followed it westbound on Route 108 in a chase that hit speeds of between 65 and 70 miles per hour. At the intersection of Route 108 and Route 216, Sergeant Anthony Smith had set up a roadblock. Almost trapped at that roadblock, the appellant and Bernard Miller attempted to back away from it at high speed, went through a fence, and turned the car over in a field. Bernard Miller was captured climbing out of the automobile. The appellant led a number of officers on an extended foot chase until they, with the aid of a helicopter, ultimately brought him to ground.

### Relevance Generally

At a significant expenditure of judicial resources and at a significant inconvenience and duplication of stress to numer-

ous witnesses, the appellant and Bernard Miller were given the benefit of having the trial of each severed from that of the other. We hold that Judge Levitz did not abuse his discretion in refusing to fragment yet further one of those two fragments into three additional fragments. "Fragment" actually is an inapt metaphor because the trial pieces do not get smaller. It is rather the case that they multiply in essentially their original size. We hold that the evidence with respect to each of the three adult victims was mutually admissible at the trial of all. Essentially, it was admissible because it was relevant in proving each of the three offenses and it was relevant for purposes other than showing the general criminal propensity of the appellant. We will attempt, nonetheless, to organize our observations as to that relevance in terms of some of the traditional and well recognized exceptions to the rule against "other crimes" evidence.

### Motive and Intent

It is hard not to merge these two ostensibly separate categories or exceptions. Proving the motive for a crime inevitably helps to prove the intent with which a criminal act is committed and *vice versa*. See *Johnson v. State,* 332 Md. 456, 470–471, 632 A.2d 152 (1993).

In this case, the episode involving Grace Lagana at the rest stop on a major arterial highway helped to supply a motive for the two subsequent carjacking attempts up in the nearby residential community. The fact that two residents of Washington ran out of gas on Interstate 95 southbound toward Washington and wandered onto the parking lot of the rest stop across the highway while looking for another car establishes a clear motive for the subsequent spree of attempted and consummated carjackings. See *Ayers v. State,* 335 Md. 602, 645 A.2d 22 (1994).

Turning to the almost indistinguishable subject of intent, the robbery of Grace Lagana was a specific intent crime. The assault with intent to rob Laura Becraft was a specific intent crime. The robbery of Pam Basu was a specific intent crime.

That robbery, moreover, was the indispensable predicate felony for the jury's finding of first-degree felony murder. The proof of a specific intent was critical with respect to all of those crimes.

Because Pam Basu did not survive and because Sarina Basu was too young to make any meaningful observations, let alone to narrate them, the evidence as to the intent with which the appellant and Bernard Miller first assaulted Pam Basu was only circumstantial. From the outward observations of the three witnesses to the initial assault, one could not conclude with certainty that the intent was to steal the car. The witnesses were initially not sure that the assault was not some sort of domestic dispute. The assault could conceivably have been sexual in nature. The assault might have been with the intent to rob Pam Basu of her purse or of her jewelry. All doubt as to the intent was removed, however, when that assault was placed in its proper perspective following immediately upon the two attempted carjackings that failed. The observation of Theresa Giddings, as the appellant and Bernard Miller left the Jaclyn Court area, moreover, clinches their purpose or intent. As Miller, following the failed carjacking, inquired, "What are we going to do now?," the appellant replied, "Don't worry. Be cool. We will get one." The two earlier incidents clearly helped to supply a motive for the assault on Pam Basu and helped to prove the intent with which the initial assault was made.

Just as Assault A and Assault B were helpful to prove the motive for and intent with which Assault C was carried out, Assault A and Assault C were also helpful to prove the intent with which Assault B was carried out. The assault on Laura Becraft had the possible outward appearance of being the least resolute of the three. Standing alone, its intent might have appeared equivocal. The appellant never announced the purpose to take her car. The grabbing for the key ring might have been explained by creative defense attorneys as no more than an effort to get the house key in order to enter her home, just a few doors away, simply to make the "emergency" telephone call which the appellant had requested and which

Laura Becraft had denied. On the other hand, there might have been an effort to explain away the entire attack as some sort of practical joke. The appellant and Bernard Miller did break it off by saying, "Sorry, lady," and, initially at least, walking nonchalantly up the street. If not successful for total exculpation, the apparently half-hearted nature of the assault might have been offered to reduce its gravity.

Under the circumstances, the unequivocal intent with which the attack on Grace Lagana had been perpetrated just a few minutes earlier left no doubt as to the intent with which the assault was perpetrated on Laura Becraft. The appellant had announced to Grace Lagana, "Give me your car keys or I'll blow your fucking head off." That helped to communicate the gravity of the subsequent attack on Laura Becraft. When the appellant entered Grace Lagana's automobile and attempted to start it up, moreover, it became indisputably clear that the purpose in taking the keys was to take the car.

In the same vein, both the viciousness of the initial attack on Pam Basu and its fatal consequences helped to remove any doubt as to the serious criminal purpose of the earlier attack on Laura Becraft. For Laura Becraft, the saving grace may have been that too many of her neighbors were abroad on the street that morning or it may have been that her mini-van was not as irresistible a target for theft as was Pam Basu's BMW.

In any event, both the earlier assault on Grace Lagana and the subsequent assault on Pam Basu helped to prove the intent with which the assault was made on Laura Becraft, just as it helped to prove the gravity of that assault.

### *Identity*

On the issue of identity, all six of the mutual admissibility permutations were satisfied. The proof of identity or criminal agency with respect to each of the three episodes helped to solidify the proof of identity or criminal agency with respect to both of the other two. The unities of time and place among the three assaults helped to establish the identity of the perpetrators, as did the similarities of purpose and of modali-

ty. It was clear that the perpetrators of any one of the assaults were also the perpetrators of the other two.

Looking just at the evidence against the appellant, the positive in-court identification of Grace Lagana and the finding of the appellant's fingerprint on her Chrysler LeBaron helped to solidify the identity of the appellant as the perpetrator of the subsequent two assaults as well.

Susan Harkins made a positive in-court identification of the appellant as one of the two persons she saw running from the direction where the assault on Grace Lagana had occurred and in the direction where the subsequent assault on Laura Becraft would occur. The identification also put the appellant in the neighborhood where the yet subsequent assault on Pam Basu would occur.

Bearing directly on the Laura Becraft incident were the positive in-court identifications of Laura Becraft herself, of John Bryan, and of Theresa Giddings. The general descriptions given by Gary Lagola and Stephanie Donnelly bore directly on the Laura Becraft incident. The general descriptions of the twosome by Steven Poore and Sandra Benz coupled with their positive identifications of the appellant's companion, Bernard Miller, bore directly on the Laura Becraft incident. All of that identification testimony helped, moreover, to solidify the identification of the appellant as the perpetrator of the earlier assault on Grace Lagana and the subsequent assault on Pam Basu.

Bearing directly on the identity of the appellant as one of the perpetrators of the crimes against Pam Basu was the in-court identification of Julie Panzeri and the videotape made by Steve Basu, both of which placed the appellant in the middle of Horsham Drive minutes before the ultimately fatal attack. Also bearing directly on the identification of the appellant as the perpetrator of that crime were the general descriptions of Steven Poore, Sandra Benz, and Stephanie Donnelly of the two black males occupying the BMW that came racing past the school plus the positive identifications made by Steven Poore and Sandra Benz of the appellant's companion, Bernard

Miller, as one of those two. The appellant's fingerprints from the driver's side of the BMW and the appellant's capture as he fled from the roadblock bear directly on his identity as the perpetrator of the attack on Pam Basu.

In addition to the positive in-court identifications of the appellant, to the identifications of Bernard Miller, and to the fingerprint evidence, all of the witnesses gave detailed descriptions of the two perpetrators. They described their relative ages, their relative sizes and builds, and the fact that Bernard Miller was wearing a white tee-shirt while the appellant was shirtless.

All of that identity evidence helped, moreover, to solidify the identity of the appellant as one of the two perpetrators of the earlier attacks on Grace Lagana and Laura Becraft. Each episode helped to prove the other two.

In *State v. Faulkner*, 314 Md. 630, 637–638, 552 A.2d 896 (1989), Judge Adkins analyzed at length the so-called "identity exception" to the rule against evidence of "other crimes." He catalogued ten different ways in which "other crimes" evidence might be used to help prove identity, any one of which would be sufficient to pass muster. The evidence in this case was mutually admissible to help prove identity in no less than five of those ten ways described by Judge Adkins:

> [E]vidence of other offenses may be received under the identity exception if it shows any of the following:
>
> (a) the defendant's presence at the scene or in the locality of the crime on trial;
>
> .   .   .   .   .
>
> (g) that the defendant had on another occasion used ... the same confederate as was used by the perpetrator of the present crime;
>
> (h) that a peculiar *modus operandi* used by the defendant on another occasion was used by the perpetrator of the crime on trial;

(i) that on another occasion the defendant was wearing the clothing worn by or was using certain objects used by the perpetrator of the crime at the time it was committed;

(j) that the witness' view of the defendant at the other crime enabled him to identify the defendant as the person who committed the crime on trial.

The appellant argues, with apparent reference to this issue of identity, that "the attendant prejudice ... greatly outweighed the probative value." He asserts that in this weighing of prejudice against probative value, "the State's need for the other crimes evidence is a factor that the court must consider." The suggestion seems to be that the cumulative evidence of the appellant's identity was a case of "overkill" because "the defense at trial essentially conceded that appellant was one of the two perpetrators."

The argument is badly flawed in several regards. In the first place, as we have discussed at great length, in a joinder/severance determination, such as that involved in this case, one does not weigh 1) prejudice against 2) probative value and need as one might in the evidentiary context. In the joinder/severance context, the comparative weighing is that of 1) prejudice against 2) judicial economy.

What the appellant's assertion does, however, is to illustrate why any weighing of 1) prejudice against 2) probative value and need would not, in any event, be appropriate in the joinder/severance context. In the evidentiary context, the trial judge might well be in a position to assess need, because a large part of the trial might already have unfolded when the admissibility issue first arose. In the joinder/severance context, by contrast, the decision must be made pretrial and there would be no way to foretell with precision what the ultimate need for evidence might be as the trial progresses.

In this case, to be sure, the identity of the appellant as one of the two perpetrators was solidly established again and again. The appellant did, indeed, "essentially concede" that fact. If by virtue of a pretrial severance, however, the State's evidence in this regard had been reduced by two-thirds with

respect to any of the identifications, the defense tactic might well have been otherwise. When the pretrial joinder/severance issue had to be decided, there was no way to predict with certainty whether the appellant's identity as the perpetrator of any of the three offenses would be "essentially conceded" or whether it would be bitterly disputed. The evidence helping to prove identity from each crime to the next was relevant and, therefore, mutually admissible. As this case well illustrates, the "need" factor is simply not a consideration in the joinder/severance weighing operation as it is in the purely evidentiary weighing operation.

### Closely Related or Connected Crimes

If mutual admissibility had to be assessed in self-contained and mutually exclusive categories rather than collectively, the leading category for admissibility in this case would probably be the one spelled out by *Tichnell v. State*, 287 Md. 695, 712, 415 A.2d 830 (1980):

> Other exceptions have been recognized as well. One such exception permits the admission of evidence of other crimes when the several offenses are so connected or blended in point of time or circumstances that they form one transaction, and cannot be fully shown or explained without proving the others. (citations omitted).

In *Tichnell*, Chief Judge Murphy took pains to distinguish the situation before the Court there from that in *State v. Jones*, 284 Md. 232, 395 A.2d 1182 (1979), a case relied upon by the appellant there and relied upon by the appellant here. Judge Murphy spelled out that in *State v. Jones* the defendant's three different robberies and robbery attempts, held not to be mutually admissible, had been spread out over a wide area of Baltimore City and over a period of two-and-a-half hours. By contrast, the two crimes in *Tichnell* had occurred within fifteen minutes of each other just as all three crimes in this case had occurred within between twenty and twenty-five minutes of each other. In *Tichnell*, as here, everything occurred within a "tightly confined" geographic

area. The Court of Appeals there held that the trial consolidation was proper:

As we have indicated, the offenses consolidated for trial were closely related to each other and occurred within a fifteen-minute period within a tightly confined area near Davidson's store. Among other reasons, the proximity of time and space within which the offenses were committed distinguishes this case from *Jones*.

287 Md. at 713, 415 A.2d 830. In *Frazier v. State*, 318 Md. 597, 611, 569 A.2d 684 (1990), the Court of Appeals also observed:

[T]he case here was significantly different from *Jones*, in which we applied the principle, even though the factors of time and proximity of the offenses were more restricted than those in *McKnight*. It involved, as we noted *supra*, robberies or attempts to rob persons at three different business establishments within the course of two and one-half hours. The case now being reviewed was more akin to *Tichnell*, where we refused to apply the principle. The offenses in *Tichnell* were closely related to each other and occurred within a fifteen-minute period within a tightly confined area.

Without rehearsing the lengthy evidence in this case, it is clear that the three episodes that were tried together formed one closely connected and closely related totality so that one of the parts could not be "fully shown or explained without proving the others." *Tichnell v. State*, 287 Md. at 712, 415 A.2d 830.

It would have made no sense for the appellant and Bernard Miller to have been in that self-contained and relatively isolated residential community, where the second and third criminal episodes took place, at shortly after 8 o'clock in the morning but for the explanation provided by the Grace Lagana incident. The use of the arterial Interstate 95 between Baltimore and Washington and the running out of gas explained their presence on the parking lot where Grace Lagana was attacked. Their flight from that crime scene, as others started

running to the assistance or to the support of Grace Lagana, then explained their presence, on foot, up the hill from the interstate. The testimony of Susan Harkins supplied clear linkage as she saw the appellant and Bernard Miller running from the area where the assault on Grace Lagana took place toward the area where the assault on Laura Becraft would take place.

A number of witnesses saw the two men running from the vicinity of the Laura Becraft assault in the direction of Pam Basu's residence and a few minutes later saw the speeding BMW moving in the opposite direction. The story of what occurred between 8 A.M. and 8:25 A.M. could not intelligibly be told in part. The events were "so connected or blended in point of time or circumstances that they form[ed] one transaction." 287 Md. at 712, 415 A.2d 830. The geographic proximity and the tightness of the time period first between the Grace Lagana assault and the Laura Becraft assault and then between the Laura Becraft assault and the Pam Basu assault were as close as those between the two episodes that concerned the Court of Appeals in *Tichnell.*

### Modus Operandi

Although *State v. Faulkner,* 314 Md. 630, 552 A.2d 896 (1989) treats the situation of where the *modus operandi* of each of several crimes is "so nearly identical in method as to earmark them as the handiwork of the accused" or where they are "so unusual and distinctive as to be like a signature," 314 Md. at 638, 552 A.2d 896, *Ross v. State,* 276 Md. 664, 670, 350 A.2d 680 (1976) seems to conceptualize the phenomenon as an autonomous exception. In either event, *State v. Faulkner,* in commenting on the phenomenon, 314 Md. at 639, 552 A.2d 896, cited with approval the opinion of Judge Wilner (now Chief Judge Wilner) for this Court in *Moore v. State,* 73 Md.App. 36, 533 A.2d 1 (1987), *cert. denied,* 311 Md. 719, 537 A.2d 273 (1988) and observed:

> *Moore* involved an assailant who committed three separate attacks. Each of the victims was encountered at the same time of day and approached and attacked in a similar

manner. When considered together these unremarkable characteristics portrayed a specific *modus operandi*. (citation omitted).

The three victims in this case were each unescorted women who had just gotten into an automobile or who were standing beside an automobile with the ignition keys out.

### Consciousness of Guilt

It was *State v. Edison*, 318 Md. 541, 547, 569 A.2d 657 (1990), which established that "prior criminal conduct ... may be admitted to show ... consciousness of guilt." Flight from the scene of a crime, as *Edison* analyzed at length, is a common method of showing consciousness of guilt. In this case, the appellant and Bernard Miller were spotted by the highway patrol within an hour of the third and final crime in the stolen BMW. They led the police on a high-speed chase, crashed through a fence in an attempt to elude a roadblock, and then the appellant led the police on an extended foot chase through the fields. That evidence of consciousness of guilt was mutually admissible with respect to all three of the crimes that had been committed little more than an hour before.

### Level of Participation

As *Harris v. State*, 324 Md. 490, 501, 597 A.2d 956 (1991) explained, the "recognized exceptions to the exclusionary rule are not exclusive" and are but "a representative list of examples in which evidence has been found to meet the exception to the general rule of exclusion." We believe that the case now under consideration involves a new exemption from that exclusionary principle, one that has not heretofore been given formal recognition as one of the "exceptions."

The appellant was facing the possibility of capital punishment. To render him eligible for capital punishment, the State was required to prove that he was the principal in the first degree in the murder of Pam Basu. It had to prove, therefore, that he was the operator of the BMW during the

insane drive that dragged Pam Basu to her death. Various witnesses placed him behind the wheel by process of elimination, by showing Bernard Miller to have been occupying the passenger seat. The level of the appellant's participation was a critical issue in the case, for the appellant had apparently persuaded Bernard Miller to admit, in a series of videotaped confessions, to have been "the wheel man." Under the circumstances, any evidence that helped to place the appellant behind the wheel was of critical importance to the State.

The evidence describing the assault on Grace Lagana and the assault on Laura Becraft helped, at least obliquely, in that regard. It established the appellant as the dominant figure, the spokesman, the ring leader, or the senior partner of the criminal twosome. Far from being redundant, it was apparently not enough for the appellant was not given the death sentence. It was legitimate ammunition for the State to have used, however, in its effort in that direction.

### Essential Relevance

The ultimate analysis of mutual admissibility, however, is not a game of shuffleboard. It is not necessary to collect a given quantum of probative value or evidentiary purpose into a square marked "motive" or marked "intent" or marked "identity," etc. For a variety of those traditional illustrative purposes and for other purposes as well, the evidence with respect to each of the three criminal incidents in this case was relevant to prove the appellant's guilt of the others. It was relevant for a purpose other than that of showing his criminal propensity. Under the circumstances, the evidence was *mutually* admissible and Judge Levitz did not abuse his discretion in refusing to sever the trials of the three sets of charges from each other.

### A Concluding Comment

This trial extended over ten full trial days and involved the calling of thirty-four witnesses. The appellant had already had the benefit of having his trial severed from that of his codefendant, Bernard Miller, a benefit to which he was not

necessarily entitled as a matter of law. If he were correct in his argument that he was entitled to yet a further severance into three additional trial packages, Bernard Miller presumably was entitled to the same thing. To take this incredible expenditure of time, of money, and of judicial resources, not to mention the toll upon the witnesses, and to multiply it not by two but by six would be profligately irresponsible. Solicitude for a criminal defendant is appropriate to a point. A sane society, however, is not required to bankrupt itself in order to indulge one indicted for crime with every tactical edge he might desire. Whatever the issue, cost always matters.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*